United States Court of Appeals,

Eleventh Circuit.

No. 95-8682.

Robert Lewis COLLIER, Petitioner-Appellant,

v.

Tony TURPIN, Warden Georgia Diagnostic and Classification Center, Respondent-Appellee.

Sept. 21, 1998.

Appeal from the United States District Court for the Northern District of Georgia. (No. 4:91-CV-169-RLV), Robert L. Vining, Jr., Judge.

Before TJOFLAT, DUBINA and BARKETT, Circuit Judges.

TJOFLAT, Circuit Judge:

Robert Lewis Collier appeals the denial of his petition for a writ of habeas corpus. In 1978, Collier was convicted in the Superior Court of Catoosa County, Georgia, of felony murder, aggravated assault, and three armed robberies. Collier was sentenced to death for the murder conviction. The murder occurred as Collier fled from the scene of three armed robberies; the victim was a deputy sheriff. Collier's petition for habeas corpus relief presented a number of constitutional challenges to both his convictions and his death sentence. In this appeal, however, Collier primarily challenges the district court's conclusion that his death sentence is not constitutionally infirm. He contends that, in violation of *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the superior court impermissibly limited the scope of the mitigating evidence that he was permitted to present to the jury during the sentencing phase of his trial. Alternatively, Collier argues that, in violation of the Sixth and Fourteenth Amendments to the Constitution, his attorneys rendered ineffective assistance of counsel in failing to present evidence of his background and character that likely would have led the jury to impose a sentence of life imprisonment rather than of death. We

conclude that Collier's counsel were ineffective, and therefore direct the district court to issue the writ with respect to Collier's death sentence.

## I.

### A.

On April 14, 1978, Collier left his home in South Pittsburgh, Tennessee, and drove to Fort Oglethorpe, Georgia, intending to commit a robbery. In Fort Oglethorpe, Collier parked his car beside a fast food restaurant, placed a .32 caliber revolver in a grocery bag, and walked to a nearby floral shop. After entering the shop, Collier drew the revolver and demanded money from the cash register as well as from the four women present in the shop. Collier took the cash but allowed the women to keep their purses. After telling them to get down on the floor and put their hands behind their heads, Collier exited the store, walked to his car, placed the sack containing the money and the gun in the trunk, and began driving back toward South Pittsburgh.

The women in the store immediately called the police, and the Catoosa County Sheriff's Department was notified. Sheriff's Investigator George Brown responded to the call and began driving to the floral shop. While en route, Brown passed Collier driving in the opposite direction. Recognizing Collier's car from the description he had received on his radio, Brown turned his car around, caught up with Collier, and activated his blue lights. Collier immediately stopped his car and got out. Collier began walking toward Brown's car with his wallet in his hand. Drawing his gun, Brown ordered Collier to "spread eagle" and to place his hands on his car. At approximately the same time, Sheriff's Deputy Baxter Shavers arrived and approached Collier and Brown with his gun drawn. Seeing Shavers with his gun drawn, Brown holstered his own weapon and began to pat Collier down.

2

Shavers then walked up to Collier and, while pointing his gun at Collier, began to look into Collier's car. Collier grabbed the gun from Shavers, throwing Brown off of him in the process. As Brown attempted to draw his weapon again, Collier fired two shots at him, hitting him once in the hip and knocking him to the ground. Shavers had begun running toward his vehicle when Collier turned and fired shots at him. One shot hit Shavers in the neck, killing him instantly. Collier got into his car and began to drive away. In the meantime, Brown, still on the ground, had drawn his weapon and fired six harmless shots into Collier's fleeing automobile. The shots failed to disable Collier or his vehicle.

Collier returned to South Pittsburgh, gathered his wife and their two sons, and drove to Alabama. The next day, however, Collier decided to return to South Pittsburgh. He was apprehended by Tennessee law enforcement before he reached his home. Within one hour of his arrest, Collier gave a statement to a Tennessee State Trooper that implicated him in the crimes. Collier then asked for, and received, permission to contact an attorney who previously had represented him. After the attorney arrived, Collier was placed in a lineup and identified as the person who had robbed the floral shop and the four customers. Following this identification, Collier, contrary to his attorney's advice, waived his right to remain silent and gave a complete confession.

Collier thereafter waived his right to an extradition hearing, and the Sheriff of Catossa County, Georgia, took him into custody. On his return to Georgia, Collier was indicted by a Catossa County grand jury for felony murder, aggravated assault for the shooting of Brown, and three counts of armed robbery.

3

The guilt phase of Collier's trial began on Monday, September 25, 1978, and concluded on Friday, September 29, 1978, at 5:50 p.m.[1] The jury found Collier guilty as charged. After the court polled the jury and published the verdicts, the judge announced that the sentencing phase of the trial (on the murder charge) would begin that evening, following a two-hour recess for dinner.[2]

The sentencing phase began at 8:00 p.m. and concluded one hour and twenty-eight minutes later, at 9:28 p.m., when the jury retired to deliberate. The jury returned its verdict, imposing the death penalty rather than life imprisonment, at 12:05 a.m. the next morning.[3]

B.

On direct appeal, the Supreme Court of Georgia affirmed Collier's convictions and sentences for felony murder, aggravated assault, and two of the three armed robberies; the court reversed Collier's conviction for one of the armed robbery offenses because it had served as a lesser included offense of the felony murder. *See Collier v. State,* 244 Ga. 553, 261 S.E.2d 364, 374 (1979), *overruled in part by Thompson v. State,* 263 Ga. 23, 426 S.E.2d 895 (1993). Collier's petition for

---

[1]Collier was represented at trial by three attorneys, Donald Bennett, Jay Bennett, and James Secord. *See infra* note 9. The State was represented by District Attorney William Campbell and Assistant District Attorney Craig Gillenn.

[2]Neither party objected to proceeding that evening nor requested a continuance until the next day, Saturday, or the following Monday.

[3]The jury based its verdict on the following aggravating circumstances: (1) Collier committed the murder of Deputy Shavers while committing another capital felony; (2) the victim was a peace officer who, at the time of the murder, was engaged in the performance of his official duties; and (3) Collier committed the murder for the purpose of preventing his lawful arrest.

The court subsequently implemented the jury's verdict at the sentencing hearing. In addition, the court imposed the following sentences: twenty years imprisonment for the aggravated assault conviction, and consecutive ten-year terms of imprisonment for each of the three armed robbery convictions.

4

a writ of certiorari from the United States Supreme Court was denied. *See Collier v. Georgia,* 445 U.S. 946, 100 S.Ct. 1346, 63 L.Ed.2d 781 (1980). On May 14, 1980, Collier petitioned the United States District Court for the Northern District of Georgia for a writ of habeas corpus setting aside his convictions and sentences under 28 U.S.C. § 2254.[4] The district court dismissed the petition on March 31, 1982, finding that Collier had failed to exhaust his state remedies on a number of his claims for relief.

On June 23, 1982, Collier filed a petition for a writ of habeas corpus in the Superior Court of Butts County, Georgia.[5] After an evidentiary hearing, the court denied the petition on December 22, 1982, and the Georgia Supreme Court affirmed. *See Collier v. Francis,* 251 Ga. 512, 307 S.E.2d 485 (1983). On December 22, 1983, Collier filed his second petition for a writ of habeas corpus in the Northern District of Georgia. On February 28, 1984, the district court dismissed the petition for failure to exhaust state remedies; we, in turn, denied Collier's application for a certificate of probable cause to appeal.

On October 22, 1984, Collier filed a second habeas petition in the Superior Court of Butts County. The state moved to dismiss the petition pursuant to O.C.G.A. § 9-14-51 on the ground that the petition was successive. The superior court granted the state's motion and dismissed the petition on July 2, 1985; the Georgia Supreme Court thereafter denied Collier's application for a certificate of probable cause to appeal. Collier filed his third federal habeas petition in the Northern District of Georgia on October 6, 1986. Concluding that the petition was a mixed petition within the

---

[4]This was the first of four habeas petitions Collier filed in that court under § 2254; the fourth petition is the one now before us.

[5]Collier filed his petition in that court because he was incarcerated in Butts County.

meaning of *Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982), in that it contained both exhausted and unexhausted claims, the court dismissed it on May 13, 1987.

In an effort to exhaust all of his claims, Collier returned to the Superior Court of Butts County, filing a third petition for a writ of habeas corpus on September 17, 1987. Following an evidentiary hearing, the court, on October 12, 1990, rejected the petition without ruling on the merits of its claims. The court refused to entertain the merits of some of the claims because they were successive, and thus subject to dismissal under O.C.G.A. § 9-14-51; it refused to entertain the others on the ground that they were barred by the doctrine of *res judicata.* On March 1, 1991, the Georgia Supreme Court denied Collier's application for a certificate of probable cause to appeal the superior court's decision.

On August 9, 1991, Collier filed his fourth petition for a writ of habeas corpus in the Northern District of Georgia. His petition presented eighteen claims of constitutional error. The following were among the more significant: (1) during jury selection, the trial court, in violation of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), improperly prohibited defense counsel from asking the venire persons whether they would automatically impose the death penalty upon a finding of guilt—a so-called "reverse-*Witherspoon* " claim; (2) the trial court denied Collier a trial by an impartial jury by refusing to grant Collier a change of venue; (3) the Georgia death penalty statute, as applied, was unconstitutionally discriminatory; (4) the trial court improperly limited the scope of evidence Collier could present at the sentencing phase of his trial, in violation of *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); and (5) Collier was denied the effective assistance of counsel, particularly during the sentencing phase of his trial.

6

The district court held an evidentiary hearing on Collier's petition on January 27-28, 1994. In a comprehensive order dated February 28, 1995, the court concluded that Collier's claims lacked merit and denied relief. On the "reverse-*Witherspoon*" claim, the court found that Collier's counsel attempted to question only two venire persons about their propensity to impose the death penalty and that in only one of those cases did the trial judge prevent counsel from inquiring; moreover, counsel did not object to the court's ruling in either case. As for the change-of-venue issue, the district court found that comprehensive questioning of the venire persons by the trial judge and counsel revealed no bias against Collier and that the pretrial publicity was not "so inflammatory and prejudicial as to warrant a change of venue."

Turning to Collier's claim that the death penalty was applied in a discriminatory manner in Georgia, the district court ruled that the claim failed because Collier had not established that his death sentence was the result of discrimination by the decisionmakers in his case. Finally, with regard to Collier's claims of constitutional infirmity at the sentencing phase, the district court found that Collier had neither shown that the trial judge improperly limited the scope of evidence that he could present in mitigation nor demonstrated that his counsel were ineffective. The district court entered its judgment denying the writ on March 1, 1995. Collier thereafter filed a motion to alter the judgment, which was denied on April 28, 1995. After the court granted Collier's application for a certificate of probable cause to appeal, this appeal followed.[6]

II.

---

[6]We have jurisdiction to entertain this appeal under 28 U.S.C. § 1291 (1994).

7

Collier's brief on appeal raises essentially the same claims as those he presented to the district court. The majority of his claims lack merit.[7] We therefore reject them without comment, and limit our discussion to the claim that the sentencing phase of Collier's trial was constitutionally deficient. The gravamen of this claim is that the jury was not presented with the wealth of available mitigating evidence that would have caused it to impose a sentence of life imprisonment rather than a sentence of death. Collier contends that the jury did not receive this evidence for two reasons. First, the trial judge—in an off-the-record chambers conference shortly before the sentencing phase of the trial began—improperly limited the mitigation evidence defense counsel could present, in violation of *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). Second, defense counsel failed to provide the effective assistance of counsel required by the Sixth and Fourteenth Amendments to the Constitution. We address these two arguments in order.

A.

The United States Supreme Court decided *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), on July 3, 1978, less than three months prior to Collier's trial. In *Lockett,* the Court was presented with the question of whether Ohio "violated the Eighth and Fourteenth Amendments by sentencing Sandra Lockett to death pursuant to a statute that narrowly limit[ed] the

---

[7]These claims, which challenge Collier's convictions and/or his sentences, are: (1) that the trial court improperly prohibited defense counsel from inquiring into whether the venire persons would automatically impose the death penalty—Collier's "reverse-*Witherspoon* " claim; (2) that Collier's death sentence was the result of the racial bias of the decisionmakers; and (3) that the trial court infringed on Collier's constitutional right of confrontation by admitting testimony of witnesses who had been hypnotized. In addition to advancing these challenges to his convictions and sentences, Collier contends that we should vacate the district court's judgment and remand the case for further proceedings because the district court erred in refusing to consider evidence of the racial bias of both the trial judge and his lead defense attorney. This claim is without merit as well.

sentencer's discretion to consider the circumstances of the crime and the record and character of the offender as mitigating factors." *Id.* at 589, 98 S.Ct. at 2956-57 (footnote omitted). The Court found that the "qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed." *Id.* at 604, 98 S.Ct. at 2964. The Court concluded, therefore, that "the sentencer, in all but the rarest kind of capital case, [must] not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.* at 604, 98 S.Ct. at 2964-65 (footnote omitted). Collier claims that after the guilt phase of his trial ended and the sentencing phase began, the court limited the mitigating evidence that he could present to the jury in violation of *Lockett.*

1.

Collier initially raised this *Lockett* claim on direct appeal to the Supreme Court of Georgia, contending that the trial judge, Judge Coker—during an off-the-record conference with counsel in chambers shortly before the sentencing phase of the trial was to begin—instructed defense counsel that the only mitigating evidence they could introduce would be evidence of Collier's reputation in the community for truth and veracity and evidence of specific acts tending to mitigate the homicide. As evidence of this off-the-record conference, Collier's brief to the supreme court pointed to an on-the-record-colloquy between the Judge Coker and Donald Bennett, Collier's lead trial counsel. This conversation took place during the sentencing phase after Judge Coker, ruling on the State's objection, refused to allow one of Collier's mitigation witnesses to testify that he and Collier had "mutual respect" for each other. In that colloquy, Judge Coker said:

> Well, here we go again, you see, Mr. Bennett, *evidently our little talk out there, the bantering back and forth didn't mean very much to you, as to what you were going to do and*

9

*I told you the problem that we get into by just doing these things, and evidently your memory has become rather short.* I know what you told me you were going to do, and I felt it might be all right in a case like this.

(emphasis added). Later in this exchange with Bennett, the judge again referred to a prior discussion, stating, "Well now, Mr. Bennett, I don't want to get into a hassle with you over the thing, because *I thought we had an understanding back there on the list of questions that you would submit to these witnesses.*" (emphasis added).

Despite the above references in the trial transcript, and the fact that Collier's counsel had briefed the issue, the Supreme Court of Georgia, in its opinion disposing of Collier's appeal, limited its discussion to whether Judge Coker improperly excluded the testimony of the witness' "mutual respect" for Collier. *See Collier v. State,* 244 Ga. 553, 261 S.E.2d 364, 375-76 (Ga.1979). The supreme court held that, although evidence that is inadmissible under the rules of evidence may be admissible as mitigation, the witness' statement about his "mutual respect" for Collier was "not highly relevant" and "somewhat cumulative"; therefore, Judge Coker had not abused his discretion in excluding it. *Id.* at 376.[8]

Collier raised his *Lockett* claim again in his first state habeas petition to the Butts County Superior Court. The court held an evidentiary hearing on October 14, 1982, regarding the alleged off-the-record conversation between Judge Coker and the defense counsel. Jay Bennett, a member of Collier's defense team and son of Collier's lead trial counsel, Donald Bennett,[9] represented Collier

---

[8]The court also noted that defense counsel "did not make any offer of proof of any specific acts of good conduct nor did he attempt to offer evidence of such acts. In fact, the one response of the witness now in question was the only evidence excluded by the trial court during the sentencing phase of appellant's trial." *Id.*

[9]Donald Bennett, Jay Bennett, and the third member of Collier's defense team, James Secord, all participated in the prosecution of Collier's first and second federal habeas corpus petitions

at the evidentiary hearing and testified in place of his father as to the events of the trial. Jay Bennett testified that, prior to the beginning of the sentencing phase, Judge Coker summoned him, his father, and the District Attorney, William Campbell, to the court's chambers for a conference about the evidence to be presented during the sentencing phase of the trial.[10] Bennett stated that his father informed Judge Coker that they had fourteen witnesses to present and that they intended to have the witnesses testify about specific instances from Collier's past. According to Bennett, they told Judge Coker that these witnesses would testify to

> [a] number of specific instances in Mr. Collier's life, rescuing an individual from drowning, his career in school [in South Pittsburgh], instances where we felt he had proven and that he had made positive contributions to the community. Facts not relating to the crime itself but facts relating to Mr. Collier's personality, his background. Facts relating to his diabetes and the effect of diabetes on his behavior, when his blood sugar level would be out of balance. And testimony showing the history of his living in that South Pittsburgh community.

Judge Coker refused to allow the proffered testimony, responding, as Bennett related,

> in no uncertain terms that we could not go into any evidence relating to the individual except for opinion testimony as to his reputation for truth and veracity. He said this is a criminal trial. You are bound by the rules of evidence. You can introduce evidence relating to the crime itself but no specific facts, no individual opinions, nothing from the accused's background.

On cross-examination, Bennett testified that Judge Coker told defense counsel on two occasions that the evidence they could present would be limited—first, when Judge Coker met them out on the

---

and his first state habeas corpus petition. Jay Bennett was the only member of the defense team who testified at the October 14, 1982, evidentiary hearing.

[10]Assistant District Attorney Gillenn attended a portion of the chambers conference to present the State's position on the admissibility of Collier's Florida conviction for manslaughter, which the State wished to introduce at the sentencing phase of the trial. According to Gillenn, mitigation evidence was not a topic of discussion while he was present.

11

street as he was walking to dinner, and again in the judge's chambers shortly before the trial resumed. On the latter occasion, the District Attorney was present.

After testifying, Jay Bennett called William Campbell to the stand to testify as to his recollection of the events in question. Contrary to Bennett's assertions, Campbell testified that Judge Coker told defense counsel that he would give them wide latitude to present mitigating evidence. Campbell stated that "[t]here was no way the Court held them to the rigid rules of evidence as to the character witness [sic], period." Campbell testified that the judge's chambers conference with counsel prior to the sentencing phase mainly concerned whether the State could present evidence of Collier's prior manslaughter conviction in Florida; Judge Coker ruled against him and excluded the evidence. Judge Coker also instructed Campbell to "sit pretty solemn and quiet" during sentencing.[11] Campbell noted that whereas he proffered the evidence (the conviction) he intended to introduce during the sentencing phase, defense counsel made no proffer of the evidence they intended to present; in fact, they did not reveal what they intended to present until their witnesses took the stand.

Because of health problems, Judge Coker did not appear at the evidentiary hearing. He was able to appear for deposition the day after the hearing,[12] however; his deposition was made part of the evidentiary hearing and considered by the court. Judge Coker's memory of the off-the-record conversations with counsel differed substantially from Jay Bennett's. Judge Coker recalled the

---

[11]On direct examination, Campbell agreed that there were a number of off-the-record conferences between the court and counsel. Most of these conferences were between the court and defense counsel, who repeatedly asked Judge Coker to accept a plea agreement under which Collier would receive a life sentence.

[12]At the deposition, Donald Bennett appeared for Collier and questioned Judge Coker.

12

off-the-record chambers conference he convened between the guilt and sentencing phases of the trial, and said that he probably advised counsel that the presentation of evidence at the sentencing phase would be "governed primarily by the rules of evidence." He was certain, however, that, after the trial resumed, he permitted defense counsel to go beyond the rules of evidence and to introduce evidence of Collier's family life and work habits, as well as whether or not Collier paid his bills on time. His recollection was that defense counsel proffered as mitigating evidence no specific acts from Collier's past, and that he placed no limitation on what counsel could ask their witnesses. Judge Coker said that he had no idea of the testimony defense counsel intended to elicit from their witnesses; his bottom line was, "ask the question and then let me rule on it."

Despite holding an evidentiary hearing and taking extensive testimony regarding the existence and substance of the off-the-record conference between Judge Coker and counsel, the superior court's order disposing of Collier's habeas petition said remarkably little about his *Lockett* claim. The order merely noted that "[t]he Supreme Court has concluded that the trial court did not err in excluding certain evidence offered in mitigation." As for the new evidence adduced at the evidentiary hearing, including Judge Coker's deposition, the court concluded that the evidence failed to establish a *Lockett* violation.

Collier appealed the court's decision to the Georgia Supreme Court. That court, noting that the "record of the trial fails to disclose any offer of proof which was made relating to the restrictions allegedly placed on counsel," affirmed the lower court's ruling that Collier had not carried his burden of proving that the trial court, in an off-the-record ruling, had limited the mitigating evidence the defense could bring before the jury. *Collier v. Francis,* 251 Ga. 512, 307 S.E.2d 485, 487 (1983).

13

Although Collier renewed his *Lockett* claim in his next two federal habeas corpus petitions, the merits of the claim were not reached in either of those actions; both petitions were dismissed on procedural grounds. The first federal court ruling on the merits of Collier's *Lockett* claim therefore occurred in the district court proceeding now under review. Based upon its examination of the record developed by the Butts County Superior Court in October 1982, the district court found that the testimony of Collier's attorney, Jay Bennett, the prosecuting attorneys, Campbell and Gillenn, and Judge Coker all were credible.[13] Because there was a direct conflict between the version of the off-the-record conferences offered by defense counsel and the version recalled by Judge Coker and the prosecutors, the court found the evidence to be "equal as to what occurred"—in essence that the evidence was in equipoise—and therefore ruled as a matter of law that Collier had not carried his burden of establishing a *Lockett* violation.

In reviewing a district court's resolution of a *Lockett* claim, we accept the district court's findings of fact unless they are clearly erroneous, and we review the court's conclusions of law *de novo.* Respondent contends, in his brief to this court, that the district court's conclusion that the evidence bearing on Collier's *Lockett* claim was "in equipoise" is a factual determination, and thus subject to the clearly erroneous standard of review. We believe that there is only one way in which evidence of a historical fact may be in equipoise. When a trial court is presented with circumstantial evidence that yields equal, opposing inferences, the evidence as to the inferential facts is in

---

[13]At an evidentiary hearing held on January 27-28, 1994, the district court heard the testimony of two of Collier's trial attorneys, Jay Bennett—who had testified in the state habeas corpus proceeding in the Butts County Superior Court—and James Secord. The court disregarded their testimony, however, choosing instead to rely on the cold record of the state proceeding. The district court disregarded Bennett's and Secord's testimony because their testimony did not add to the evidence developed in the state proceeding.

14

equipoise—neither inference is more likely to be true than the other. We are not presented with that situation here. Instead, we are presented with a swearing match. One of Collier's trial attorneys presents one version of the off-the-record conferences that took place before the sentencing phase of the trial commenced; Judge Coker and the prosecutors present another. By finding that the versions presented by both sides of the dispute were "credible," and that the evidence as to what transpired at the conference was therefore in equipoise, the district court made no factual determination at all. The evidence offered by both sides constituted direct, not circumstantial, evidence, and a fact finding required a choice between the two contradictory versions of events. Because the district court did not make such a choice, its determination that the evidence is "in equipoise" is entitled to no deference.[14]

Ordinarily, we would remand the case to the district court and instruct it to make a credibility choice and resolve the dispute. Because in our view only one credibility choice is reasonable given the record this case presents, however, we forego a remand and proceed to decide both the *Lockett* issue and Collier's claim that his attorney's performance failed to pass constitutional muster.

2.

We first note that it is difficult to believe, as Jay Bennett asserted in his testimony before the Butts County Superior Court, that Judge Coker would have prohibited Collier's attorneys from presenting any evidence of character other than Collier's reputation in the community for truth and veracity. Collier did not testify in either the guilt phase or the sentencing phase of the trial; thus,

---

[14]In effect, the district court fashioned the following rule to deny Collier relief on his claim: if the court (in a bench trial) could reasonably believe the testimony offered by both sides of an issue, the court need not decide which testimony is true—because the evidence is in equipoise—and the party with the burden of proof loses.

15

his reputation for truth and veracity was entirely irrelevant.[15]  Such a limitation by the trial judge would not simply have violated *Lockett,* it would have been absurd.  Nevertheless, given the conflicting accounts provided by Jay Bennett on the one hand, and Judge Coker, Campbell, and Gillenn on the other, we look to the transcript of the sentencing phase of the trial for evidence that might shed light on what Judge Coker actually said to defense counsel off the record.

Collier contends that statements made by Judge Coker on the record following the prosecutor's objection to the testimony of his third witness, Shelly Jordan—that he had "mutual respect" for Collier—support his claim that the judge improperly limited the mitigation evidence his attorneys could present.  The transcript reveals that Collier's counsel began the sentencing phase by asking the first two witnesses a few brief questions about their personal history and association with Collier, and then about Collier's reputation in the community for truth and veracity, whether the witness would believe Mr. Collier under oath, and little else.[16]  The third witness called to the stand was Shelly Jordan.  Donald Bennett began the direct examination of the witness by asking foundational questions, apparently as a predicate to inquiring about Collier's reputation.  The following transpired:

MR. BENNETT: What has been your association with Mr. Collier?

---

[15]The indictment in this case did not charge Collier with perjury or some other false statement offense as to which his reputation for truth and veracity would be relevant.  The only statement made by Collier that was before the jury was his confession to the crimes of murder, aggravated assault, and armed robbery.  By presenting evidence of Collier's reputation for truth and veracity, Collier's attorneys actually buttressed his confession that he committed those crimes.

[16]Donald Bennett did ask the first two witnesses whether they considered Collier's character, generally, to be "good" or "bad," in addition to the questions about his reputation for truthfulness.

16

MR. JORDAN: Well, we were always close friends, and always got along well, and *had a lot of mutual respect for each other.*

MR. BENNETT: Do you have that respect for him now?

MR. CAMPBELL: Your Honor, I object at this time, it's not what he thinks of him.

THE COURT: I believe you've gone a little far afield, as to his feeling for the defendant.

MR. CAMPBELL: It's whether he knows him in the community where he lives, and not what he thinks about him, but what the people in that community, it's not what he thinks, it's what the people in the community think.

THE COURT: I think you should be a little more limited in your examination of the witnesses relative to anything in mitigation.

MR. BENNETT: Is it Your Honor's ruling that I cannot ask him his personal opinion as to what he thinks of this defendant?

THE COURT: His reputation in the community.

(emphasis added). In the ensuing conversation, which took place outside the presence of the jury but on the record, Judge Coker acknowledged that there had been some discussion with counsel prior to the sentencing phase about the evidence the defense could offer. In contrast to Jay Bennett's testimony (at the habeas hearing before the Butts County Superior Court) that Judge Coker told Collier's counsel what evidence they could present, however, Judge Coker said, "I know what *you told me* you were going to do, and I felt it might be all right in a case like this." Moreover, Judge Coker's statements on the record belie Bennett's statement that Judge Coker restricted the testimony to Collier's reputation in the community for truth and veracity and evidence in mitigation of the crime itself. Judge Coker said:

I told you that these things that [are] admissible, *it's about his reputation in the community for being industrious, for working, or supporting his family, or things like that, I think that would be mitigating,* but because you might have a mutual admiration for him, that is not a mitigating circumstance, and I am going to rule that personal thoughts of him, whether

17

they're good friends or buddies, it doesn't really have any bearing on the issues, that's what I'm trying to say.

(emphasis added).

As is apparent from this statement, Judge Coker felt that the testimony regarding the witness' "mutual respect" for Collier was not mitigating evidence. He repeatedly inquired of Donald Bennett as to how the evidence was mitigating, stating several times that he, personally, did not think that the evidence was relevant. In addition, Judge Coker asked how the proffered testimony was in "mitigation or extenuation *of punishment,*" not of the crime itself. Although there are indications in the sentencing phase transcript that Judge Coker felt that he was generally bound by the rules of evidence (in fact, he admitted as much during his deposition in the state habeas proceeding), there are ample indications that Judge Coker was willing to accept evidence that would not be admissible under a strict application of the rules of evidence.

Finally, we note that Donald Bennett asked Judge Coker whether he could ask other witnesses the question he had put to Shelly Jordan without being "criticized" by the court. Judge Coker, as he testified was his practice, responded: "I think you'll need to ask the question before I make a determination as to whether it's in mitigation or not, whether it complies with the rules of evidence." Bennett did not ask the question again, nor did he make a proffer of any testimony he thought Judge Coker had excluded during the off-the-record chambers conference held before the sentencing phase commenced. This is not a surprising result, given that Judge Coker did not limit or exclude any of the mitigation evidence, other than Shelly Jordan's statement that he had "mutual respect" for Collier, that the defense team endeavored to bring before the jury. If Judge Coker had limited the presentation of mitigating evidence in the way Bennett claims, he likely would have excluded other evidence offered by the defense during the sentencing phase; that he did not exclude

18

other evidence during the sentencing phase suggests that no such limitations were placed on the defense during the pre-sentencing phase conference.

3.

We conclude that the record does not support Collier's claim that the trial court improperly limited the scope of the evidence the defense team could offer in mitigation during the sentencing phase of the trial. Although the record suggests that defense counsel may have been confused about the extent of the testimony the court would allow them to elicit from their witnesses, and that the court may have had a more narrow view than *Lockett* embraced concerning the sort of evidence that could appropriately be admitted during the sentencing phase of a capital case, the evidence does not support Jay Bennett's position that Judge Coker told the defense team that all he would allow would be testimony of Collier's reputation in the community for truth and veracity and evidence of acts mitigating the crime itself. As noted above, the only evidence Judge Coker excluded was Shelly Jordan's statement that he had "mutual respect" for Collier—testimony which, although largely irrelevant, arguably should have been admitted given the broad latitude accorded to capital defendants to present mitigation evidence. Furthermore, Judge Coker's on-the-record statements as to the evidence that, in his view, would constitute mitigating evidence seriously undermines Jay Bennett's claim that the only evidence that could be introduced was testimony of Collier's reputation for truth and veracity and evidence in mitigation of the crime itself. Collier's *Lockett* claim accordingly fails.

B.

Collier claims, alternatively, that he was deprived of his right to the effective assistance of counsel during the sentencing phase of his trial. First, Collier contends that his attorneys were

19

ineffective because their investigation in preparation for the sentencing phase was deficient; they failed to interview and present testimony from numerous close personal friends and relatives who could have provided persuasive mitigating evidence, and they failed to explore and present readily available expert opinion evidence regarding his diabetes and diffuse organic brain damage. Second, Collier contends that counsels' actual presentation at the sentencing phase of trial was ineffective in that they failed to elicit, from the witnesses who did testify, anecdotal evidence regarding his personal history, diabetic condition, and specific circumstances bearing on the robberies and murder that would have effectively foreclosed the death sentence. Collier contends that his attorneys also were ineffective because they failed to object on the record to the court's perceived (by them) limitation of mitigation evidence and failed to make an offer of proof as to what his witnesses would have said had they been permitted to testify.[17]

1.

The first time Collier alleged that his attorneys rendered ineffective assistance of counsel during the sentencing phase was in his first state habeas petition. At that time, Collier was still being represented by his defense team. Not surprisingly, then, the claim was not premised upon volitional

---

[17]In a residual clause in his brief encompassing all of the claims that he presented to the district court but, due to space limitation, he was unable to include in his brief, Collier incorporated several other grounds for his ineffective assistance claim. To the extent those grounds relate to counsels' alleged ineffectiveness during the guilt phase of the trial, we believe that the district court properly disposed of them. Our finding that Collier has not demonstrated that his counsel were ineffective in the guilt phase does not affect our examination of their performance in the sentencing phase. We evaluate the attorneys' performances during each "discreet portion[ ] of a trial without regard to the attorney[s'] performance[s] at other points during the trial." *Horton v. Zant,* 941 F.2d 1449, 1461 (11th Cir.1991).

        With respect to the additional examples of ineffective assistance in the sentencing phase that Collier presented in this "catch-all" residual clause, we need not consider them given our holding that counsel were ineffective in the sentencing phase.

ineffectiveness of trial counsel, but rather upon the same allegations that underpinned his *Lockett* claim—that Judge Coker rendered counsel ineffective when he precluded counsel in an off-the-record ruling from presenting any substantial mitigating evidence. As it did with Collier's *Lockett* claim, the state habeas court concluded that Collier had not carried his burden of proof on this ineffective assistance claim. Collier, still represented by his defense team, *see supra* note 9, presented the same claim in his second federal habeas petition, but the petition was dismissed because Collier had not exhausted his state remedies with respect to all of his claims.

Collier parted ways with his defense team before filing his second state habeas petition, thus paving the way for new counsel to claim that Collier's defense counsel rendered ineffective assistance in the sentencing phase of his trial. The petition alleged that counsel were ineffective for failing to present "mitigating evidence that would have convinced the jury that Petitioner was not "some huge, black man,' as the prosecuting attorney frequently referred to Petitioner, with an evil and malicious heart that deserved to die." According to the petition, a wealth of evidence was available to demonstrate that Collier was a good family man, an upstanding public citizen willing to risk his own injury to help others, and that he was a diabetic who had trouble controlling his behavior when he was not properly medicated. The state habeas court concluded that the doctrine of *res judicata* precluded it from considering Collier's claim since the claim had been raised in his first state habeas petition. The court concluded, alternatively, that Collier had waived any claim of ineffective assistance that he had not raised in his first state habeas petition.

In Collier's third federal habeas petition, he raised both claims of ineffective assistance: (1) that the trial court's off-the-record-evidentiary ruling had rendered counsel ineffective; and (2) that counsel were independently ineffective for not objecting on the record to that ruling and for failing

21

to present efficacious mitigating evidence. The district court dismissed the petition without prejudice because Collier had not exhausted all of his state law claims. In his third and last state habeas petition, Collier again alleged that his attorneys' performance was ineffective, calling the court's attention to two aspects of counsels' performance that were deficient. The court found that both had been raised—albeit in different forms—in earlier state petitions and disposed of, and that the earlier dispositions were *res judicata.*

Returning to federal court, Collier once again raised his claim of ineffective assistance in his fourth habeas petition—the petition under review. The respondent contends that Collier procedurally defaulted his claim because he did not assert it until his second state habeas petition. The district court agreed with respondent and applied the "cause and prejudice" test to determine whether Collier's failure to follow the applicable state procedural rules precluded his claim. *See Wainwright v. Sykes,* 433 U.S. 72, 86-87, 97 S.Ct. 2497, 2506, 53 L.Ed.2d 594 (1977) (applying the rule from *Francis v. Henderson,* 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976), which established that petitioners who raise claims in federal habeas corpus petitions that are barred by state doctrines of procedural waiver must establish "cause" and "prejudice" for their failure to raise the claims in state court). The court held that Collier had demonstrated sufficient cause by the fact that he was represented on his first state habeas petition by trial counsel. *See Stephens v. Kemp,* 846 F.2d 642, 651 (11th Cir.1988) (holding that a habeas corpus petitioner who did not raise an ineffective assistance claim in his first state habeas petition satisfied the cause prong of the cause and prejudice test when counsel on the first state habeas petition was also trial counsel whose

performance was allegedly inadequate).[18]  The court then evaluated Collier's claim on the merits to determine whether he had established the prejudice prong of the test as well.

In its dispositive order of February 28, 1995, the district court ruled that Collier's counsel were not ineffective.  The court held that they had pursued a reasonable strategy in investigating and developing mitigating evidence, and could not be faulted for failing to pursue additional anecdotal evidence of Collier's personal history, diabetic condition, or circumstances leading up to the crimes. Additionally, the court ruled that Collier's counsel were not unreasonable for neglecting to obtain expert opinion testimony regarding his diabetes and the affect of abnormal blood sugar levels on Collier's ability to control his behavior as well as expert opinion testimony concerning diffuse organic brain damage.  The district court also held that if the trial court had restricted counsels' ability to present mitigating evidence during an off-the-record conference prior to sentencing, in contravention of *Lockett,* counsel were not "unreasonable in their beliefs that they had preserved this issue for appellate review."  Finally, the court stated that it was "not persuaded that even if Collier's trial attorneys had done all that his current counsel contend should have been done the outcome of the sentencing phase would be different."

2.

Whether a criminal defendant has received the effective assistance of counsel is a mixed question of law and fact and is subject to *de novo* review.  *See Bolender v. Singletary,* 16 F.3d 1547, 1558 n. 12 (11th Cir.1994).  "[S]tate court findings of historical facts made in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, and similar federal

---

[18]We note that, in his brief, respondent has not questioned the district court's treatment of Collier's procedural default, and therefore we do not address the merits of the procedural default issue.

district court findings are deemed correct ... unless clearly erroneous." *Id.* (citing *Bush v. Singletary,* 988 F.2d 1082, 1089 (11th Cir.1993)) (citation omitted). The test for whether counsel has provided the effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments was articulated by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under *Strickland,* a person asserting a claim of ineffective assistance must satisfy a two prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687, 104 S.Ct. at 2064. In a capital case, this two part test applies to claims of ineffective assistance during the sentencing phase as well as the guilt phase of the trial, because a "capital sentencing proceeding ... is sufficiently like a trial in its adversarial format and in the existence of standards for decision ... that counsel's role in the proceeding is comparable to counsel's role at trial—to ensure that the adversarial testing process works to produce a just result under the standards governing decision." *Id.* at 686-87, 104 S.Ct. at 2064 (citations omitted).

In subpart i, we examine Collier's claims of ineffective assistance to determine whether he has satisfied the performance prong of the *Strickland* test. In subpart ii, we determine whether Collier has demonstrated that he was actually prejudiced by the acts and omissions of his attorneys.

i.

In order to satisfy his burden of demonstrating that his trial counsel were ineffective, Collier must demonstrate that their "representation fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. at 2064. The performance inquiry thus seeks to determine whether, under

24

"prevailing professional norms," counsel's "assistance was reasonable considering all the circumstances." *Id.,* 104 S.Ct. at 2065. In evaluating Collier's ineffective assistance claim, we must give great deference to counsels' choice of strategy and execution. *Id.* at 689, 104 S.Ct. at 2065 (discussing the danger of hindsight in such an evaluation and noting that the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy") (quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955)). With these principles in mind, we first examine counsels' investigation in preparation for the sentencing phase, and then their presentation of mitigating evidence before the jury.

a.

Collier raises two distinct claims of ineffective assistance based on his counsels' failure to investigate more fully his personal history as well as his medical and mental condition at the time of the crimes. First, he contends that his attorneys failed to interview close relatives and friends who could have provided an abundance of information regarding his childhood, economic circumstances surrounding his upbringing, social environment in his hometown, diabetic condition as well as attendant physical and emotional problems, and specific events in his life that would have mitigated the sentence imposed by the jury. Second, Collier claims that his attorneys failed to pursue expert opinion testimony relating to his diabetes and to "diffuse organic brain damage." According to Collier, such testimony should have been proffered during the sentencing phase to show his reduced capacity to conform his behavior to the law, even if such testimony could not support a legal defense to the crimes themselves.

With regard to Collier's first claim—that counsel failed to interview a number of close relatives and friends of Collier that could have provided additional evidence to be used in the

25

sentencing phase of his trial—the district court found that counsels' failure to pursue those witnesses' testimony was the direct result of a conscious tactical decision. "The question of whether a decision by counsel was a tactical one is a question of fact." *Bolender,* 16 F.3d at 1558 n. 12 (citing *Horton,* 941 F.2d at 1462). Whether the tactic was reasonable, however, is a question of law and is reviewed *de novo. See Horton,* 941 F.2d at 1462. In assessing the reasonableness of the tactic, we consider "all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066.

Jay Bennett testified that the defense team thought that if they "could bring out just exactly what the so-called better class of the community over in Jasper and South Pittsburgh thought about [Collier], well, that surely the jury would give some consideration to that." Collier's lead defense attorney, Donald Bennett, was from the largely rural area in which the trial was held, and was familiar with the attitudes of the local citizenry. He was well-positioned, therefore, to determine what testimony would be most well-received by the jury. Bennett believed that the jury would be able to relate to witnesses representing the "governing part of the city." In addition, counsel thought they were limited in the number of witnesses they could present; the out-of-state witnesses from Collier's hometown in Tennessee had to be subpoenaed, court orders for their appearance had to be obtained, and witness fees had to be tendered. Donald Bennett traveled to South Pittsburgh and Jasper and interviewed quite a few potential witnesses, including Collier's wife. From those he selected fourteen to subpoena for trial, ten of whom were called to testify. They included Collier's wife, a lifelong friend, people from South Pittsburgh for or with whom Collier had worked and had known for twenty years or more, the principal of Collier's high school, a member of the South

26

Pittsburgh City Commission, and a friend of Collier's father's who had known Collier since he was a child.

As the district court noted, the witnesses whom counsel selected to testify possessed much of the information about Collier's past and character that Collier now contends should have been presented to the jury.[19] Although we might think that it would have been more prudent for Collier's attorneys to investigate other possible avenues for obtaining information about Collier's character and background, including Collier's relatives and close friends, "in considering claims of ineffective assistance of counsel, "[w]e address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp,* 483 U.S. 776, 794, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987) (quoting *United States v. Cronic,* 466 U.S. 648, 665 n. 38, 104 S.Ct. 2039, 2050 n. 38, 80 L.Ed.2d 657 (1984)). Considering all of the circumstances from the position of Collier's counsel at the time of their conduct, *see Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066, we cannot conclude

---

[19]The witnesses whom counsel called to the stand could have testified that Collier's mother died when he was an infant, and that while his father left him in the care of his aunt and uncle to raise, he kept Collier's older brother, and later remarried and had three more children. They could have testified about Collier's upbringing as a poor black child in a segregated southern town and about his gentle disposition despite his large stature; that Collier worked from an early age to help support himself and his aunt and uncle; that he persevered in school despite being a slow learner, becoming a football star in high school and then seeing his career end due to an injury during his senior year; and that he moved to Seattle after a stint in the army, and then returned to South Pittsburgh to take care of the aunt who had raised him while she was dying of cancer. The witnesses could have testified that Collier started a family upon his return to South Pittsburgh; that he was a devoted father and husband; that he worked hard to provide for his family; and that, about a month before he committed the crimes in this case, he lost his job with the Tennessee Valley Authority and was nearly out of money when he committed them. At least one witness, in addition to Collier's wife, could have testified about Collier's heroic attempt to save the life of a motorist trapped in a car that had veered off a bridge into a creek. Finally, several witnesses, and especially Collier's wife, could have testified that Collier was diabetic and that he was moody and irrational when he had either not taken his insulin or missed a meal.

that counsel were ineffective for failing to interview additional potential witnesses in preparation for the sentencing phase.

Collier's second contention is that counsel were ineffective for not pursuing expert opinions on the effects of diabetes and "diffuse organic brain damage" upon Collier's ability to control his behavior. These omissions are not premised upon any tactical choice of defense counsel. We therefore review the record to determine whether counsels' failure to obtain expert opinions fell below an objective standard of reasonableness, taking into consideration all the circumstances at the time.

We find it easy to dispose of Collier's argument that his attorneys should have obtained expert opinion testimony as to whether Collier was suffering from "diffuse organic brain damage" when the offenses occurred and whether any such brain damage would have affected his ability to control his behavior. To support his claim in the district court, Collier presented the testimony of a neuropsychologist, Dr. Joyce Carbonell, in which she stated that he suffered from "diffuse organic brain damage." Although counsel were aware before and during the trial that Collier was a "slow learner," and had difficulty reading and writing, they also knew that he had graduated from high school, held steady employment, and raised a family. In addition, Collier's expert on diabetes, Dr. Buris Boshell, testified that he did not see any clear evidence of brain damage, and that during the interview Collier was "lucid and well-oriented." We agree with the district court's conclusion that "there is nothing in the record to show how [knowledge that Collier was a slow learner] would have led a reasonable attorney in 1978 to believe that Collier was suffering from any kind of brain damage." We therefore find that it was not unreasonable for counsel to fail to investigate the potential influence of "diffuse organic brain damage" upon Collier's behavior.

28

Collier also contends that counsel were ineffective in their investigation for failing to obtain the services of a diabetes expert to examine Collier and testify in the sentencing phase of the trial. In Dr. Buris Boshell's opinion, Collier was suffering from acute hypoglycemia when he committed the crimes in this case. The district court nevertheless held that counsel were not ineffective for failing to obtain and present such opinion testimony. In making this determination, the court did not apply the performance prong of the test from *Strickland.* Instead, finding it dispositive, the court applied the prejudice prong of the test as we had applied it in *Elledge v. Dugger,* 823 F.2d 1439, 1445-48 (11th Cir.1987) (assessing a claim that counsel failed to procure an expert witness) and held that Collier had not in fact been prejudiced.[20] We conclude that Collier has demonstrated that counsel were ineffective for failing to obtain an expert on diabetes. Evaluating counsels' omission in light of all the circumstances, competent counsel would have pursued an expert opinion on the role that Collier's diabetes may have played in the criminal activity.

Our holding that counsel should have sought the opinion of an expert on diabetes is premised upon a number of established facts. First, counsel were aware that Collier's behavior was entirely out of character for a man who was universally described as gentle, respectful, and hardworking by those who knew him. Second, Jay Bennett testified that the defense team was aware of Collier's diabetes. Third, James Secord testified that not only did the defense team know that Collier had diabetes, they intended to present evidence to the jury that Collier either was not receiving the correct dosage of insulin or had not had his insulin shot on the day of the crimes. As Secord stated, "this might possibly have been a factor that would have altered his motivation or altered his

---

[20]We disagree with the district court's finding that Collier was not prejudiced by counsels' failure to obtain an expert witness to evaluate Collier and testify in the sentencing phase, but we reserve our discussion of prejudice for subpart ii of this opinion.

29

perception at the time and I remember that being to me an important aspect to get before the jury." Finally, counsel had very little evidence that mitigated the crime itself; evidence of Collier's diabetes, and the affects upon his behavior of a chemical imbalance caused by improper medication, likely would have constituted his strongest evidence mitigating the crimes Collier committed in this case. We are mindful of the need to avoid evaluating the performance of counsel with the benefit of hindsight, but even in 1978 reasonable counsel would at least have sought an expert's opinion on this issue. Counsel were thus ineffective for failing to pursue an expert on diabetes to examine Collier and testify at the sentencing phase.

b.

We next evaluate counsels' performance during the actual sentencing phase of the trial. Jay Bennett testified that the defense team "knew from the start that the whole case was going to ride on the sentencing phase." The team's conclusion is not surprising considering that Collier had been tied clearly to the crimes by eyewitness accounts, had given a full confession to authorities, and seemed to be of reasonable mental health. In fact, counsel considered having Collier plead guilty and then proceeding directly to the sentencing phase; William Campbell testified that Collier's defense team repeatedly asked Judge Coker to accept a plea of guilty in exchange for a life sentence. In short, Collier's attorneys intended to focus their efforts on presenting evidence that would mitigate Collier's sentence.

Counsels' intention of presenting a strong case in mitigation stands in stark contrast to the presentation that actually took place. After briefly summarizing the testimony that counsel adduced from Collier's ten mitigation witnesses, we then analyze whether counsels' performance fell below the objective standard of reasonableness required by the Sixth Amendment. As noted *supra,* Collier

based his claim of ineffective assistance of counsel on two alternative theories: (1) that his attorneys' conduct was constitutionally deficient, or (2) that counsels' performance was rendered ineffective by Judge Coker's ruling limiting the mitigating evidence counsel could present. The second theory, the *Lockett* claim, fails for the reasons stated in subpart A, *supra.* As for Collier's first theory, we conclude that counsels' performance did not comport with the standards of the profession and was not objectively reasonable under the circumstances; hence, the performance constituted ineffective assistance of counsel.

The sentencing phase began at 8:00 p.m. on a Friday night.[21] The defense team called ten witnesses to the stand. Despite their acknowledgment that the sentencing phase was the most important part of the trial, their examination of the witnesses was minimal. Counsel sought to elicit very little relevant evidence about Collier's character. In fact, with respect to a number of witnesses, counsel sought only their opinion of Collier's reputation for truth and veracity—a matter wholly irrelevant to the issue before the jury.[22] Furthermore, even when counsel departed from the

---

[21]The District Attorney, William Campbell, testified in the habeas hearing in the Butts County Superior Court that neither party objected to beginning the sentencing phase at that hour, although both he and Donald Bennett were tired. They did not object because the two men struck a deal; Campbell's assistant, Craig Gillenn, would make the State's closing argument to the jury, and Bennett's assistant, James Secord, would present Collier's argument.

[22]We note that Judge Coker actually prompted Donald Bennett to ask other questions of Collier's witnesses; the judge reminded Bennett of his earlier advice—that Collier's reputation "for being industrious, for working, or supporting his family, or things like that" would be relevant mitigating evidence. Despite Judge Coker's prompting, and his admonition at the conclusion of the colloquy over witness Shelly Jordan's "mutual respect" testimony, that Bennett would need to ask questions before the court could rule on the admissibility of the testimony such questions would elicit, Bennett's direct examination of subsequent defense witnesses failed to explore in any significant way the witnesses' knowledge of Collier. Bennett raced through the remaining witnesses, eliciting very little in the way of mitigating evidence from any of them, and not once making a proffer of additional evidence in response to what he perceived to be an adverse exclusionary ruling by the court.

31

truth-and-veracity line of questioning, the testimony elicited was of a nature that could not reasonably have aided the jury in its sentence determination.

For instance, Collier's eighth witness was his wife, Mary Collier. After establishing that Collier and Mary had been married five years and had two children, both boys, ages three and five, the remainder of her direct examination consisted of the following:

MR. BENNETT: And since you have been married, has Robert supported his family?

MRS. COLLIER: Yes, he has.

MR. BENNETT: Has he been a hard worker?

MRS. COLLIER: Yes, sir.

MR. BENNETT: I believe that's all I need to ask her.

On cross-examination, the prosecution had Mary Collier testify that she received $70 from Collier on the day of the crimes, money that she now knew he had stolen from the floral shop. On re-direct examination, Donald Bennett established that she was not aware of the crimes when she accepted the money.

Counsel elicited little more mitigation testimony of substance from the other nine witnesses called on Collier's behalf. After the presentation of mitigating evidence ended, the court declared a brief recess. Following the recess, counsel delivered their closing arguments, and the court charged the jury. The jury retired to deliberate at 9:28 p.m. At 12:05 a.m. the next morning, the jury returned its verdict.

In analyzing this claim of ineffective counsel, we note that defense counsel did elicit testimony that Collier had a "good" reputation, that he was generally known as a hard worker who took care of his family, and that he had a good reputation for truth and veracity. The trial transcript,

32

however, does not support the proposition that counsels' performance met the standard of objective reasonableness required by the Sixth Amendment. Counsel presented no more than a hollow shell of the testimony necessary for a "particularized consideration of relevant aspects of the character and record of [a] convicted defendant before the imposition upon him of a sentence of death." *Woodson v. North Carolina,* 428 U.S. 280, 303, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976). Although counsel were aware of the Supreme Court's opinion in *Lockett,* and recognized that the sentencing phase was the most important part of the trial given the overwhelming evidence of guilt, they presented almost none of the readily available evidence of Collier's background and character that would have led the jury to eschew the death penalty. Instead of developing an image of Collier as a human being who was generally a good family man and a good public citizen, who had a background of poverty but who had worked hard as a child and as an adult to support his family and close relatives, counsels' presentation tended to give the impression that the witnesses knew little or nothing about Collier. In failing to present any of the available evidence of Collier's upbringing, his gentle disposition, his record of helping family in times of need, specific instances of his heroism and compassion, and evidence of his circumstances at the time of the crimes—including his recent loss of his job, his poverty, and his diabetic condition—counsels' performance brought into question the reliability of the jury's determination that death was the appropriate sentence. *See Woodson,* 428 U.S. at 305, 96 S.Ct. at 2991 (noting the qualitative difference in the need for reliability in a jury's determination that death is appropriate in a capital case).

Although Collier's attorneys concede that their performance was deficient, they blame the trial judge rather than themselves for their poor display. We find that the trial judge was not to blame for counsels' ineffectiveness; rather, they were. In sum, counsel did not perform as

33

objectively reasonable attorneys would have; their performance fell below the standards of the profession and therefore their assistance at the sentencing phase of the trial was ineffective.

ii.

Being satisfied that Collier has demonstrated that his attorneys' performance at the sentencing phase of the trial fell below the standard or reasonableness required by the Sixth Amendment, we must now determine whether counsels' inadequate performance during the sentencing phase of the trial prejudiced Collier. The Supreme Court has stated that "[t]he purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding." *Strickland,* 466 U.S. at 691-92, 104 S.Ct. at 2067. To satisfy the prejudice prong of the analysis, therefore, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068.

In this circuit, in order to prove that he has been prejudiced by counsel's failure to obtain expert opinion testimony, a defendant must show not only that there is a reasonable probability that an impartial decisionmaker presented with the expert's testimony would reach a different conclusion, but also "what kind of, and how much, investigation an ordinary, reasonable lawyer would have undertaken ... [and] that it is reasonably probable that a reasonable investigation would have turned up an expert who would have presented testimony similar to that adduced." *Elledge,* 823 F.2d at 1446 n. 15. Dr. Boshell testified that a local physician in 1978 would probably not have recognized a possible relationship between Collier's actions on the day of the crimes and a potential episode of hypoglycemia brought on by Collier's not eating on that day in combination with his excessive

34

insulin dosage. Relying on this testimony, the district court held that it would have been reasonable for an attorney in 1978 to forego seeking an expert on diabetes. The court found that Collier had not "shown that a reasonable attorney in 1978 would have investigated beyond asking local physicians about diabetes and its possible effect on a person," and those physicians were unlikely to recognize the need for a specialist.

We disagree with the district court's conclusion that Collier has not demonstrated that he was prejudiced by counsels' failure to seek out an expert in diabetes. Dr. Boshell testified that either an endocrinologist, a specialist who studies diseases—like diabetes—that result from abnormalities in the endocrine glands, or a neurologist could have made the connection between Collier's medical condition and his actions on the day of the crimes. Although a general practitioner might not have recognized the connection between diabetes and Collier's behavior, nor the excessive size of his insulin dosage, a general practitioner is not an expert on diabetes. We see no reason why Collier's counsel could not have obtained the name and phone number of an endocrinologist from either the phone book or from another physician and have had that specialist both examine Collier and provide testimony at the sentencing phase of his trial.[23] Dr. Boshell testified that the school of thought upon which he based his opinions had been popular since the 1950s, and therefore, experts sharing his opinions were not difficult to locate at the time of Collier's trial. Dr. Boshell himself, who practiced and taught medicine at the University of Alabama, would have been available and would have testified the same way in 1978. Given that at least one member of Collier's defense team testified that they intended to present non-expert evidence of Collier's diabetes and its possible effect on his

---

[23]We imagine that a competent local physician, when questioned about a medical condition with which he or she was unfamiliar, would refer the questioner to a specialist with competence in that area.

behavior, we find that it was unreasonable for Collier's counsel to fail to contact an endocrinologist who could have testified about the effect of diabetes on Collier's behavior. We also find that an ordinary, reasonable lawyer would have called an endocrinologist and that it is reasonably probable that such an investigation would have led to an expert who would have presented testimony similar to Dr. Boshell's.

The final part of the test for determining whether a defendant has been prejudiced by the failure of counsel to locate an expert—whether defendant has shown that there is a reasonable probability that the testimony would affect the sentence imposed, *see Elledge,* 823 F.2d at 1446 n. 15—is the same for counsel's failure to develop and present non-expert testimony. Because a court "must consider the totality of the evidence before the judge or jury" in determining whether a defendant has shown that counsel's deficient performance was prejudicial, *see Strickland,* 466 U.S. at 695, 104 S.Ct. at 2069, we examine counsels' failure to present expert testimony on Collier's diabetes together with their failure to present other mitigating evidence during the sentencing phase of the trial in order to see if Collier has satisfied the second prong of the *Strickland* test.

Collier has sufficiently demonstrated that the failure of his counsel to make an offer of proof on the record, or effectively to present at sentencing the wealth of mitigating evidence (including expert testimony), creates a reasonable probability that, but for their errors, he would not have received a death sentence. "The purpose of a sentencing hearing is to provide the jury with the information necessary for it to render an individualized sentencing determination ... [based upon] the character and record of the individualized offender and the circumstances of the particular offense." *Dobbs v. Turpin,* 142 F.3d 1383, 1386-87 (11th Cir.1998) (internal quotations and citations omitted). The errors of Collier's counsel in the sentencing phase frustrated that purpose;

36

counsel presented ten separate witnesses, including Collier's wife, whose relevant testimony consisted almost entirely of one or two word answers to inquiries as to Collier's general reputation in the community, his reputation for truth and veracity, his reputation for hard work, and his reputation as a man who supports his family. The testimony of Collier's trial counsel in his habeas corpus proceedings, as well as the affidavits of persons who either were interviewed by trial counsel but not called to testify or who testified before the jury, demonstrates that counsel were aware of numerous facts from Collier's personal, medical, and social history that would have led the jury to forego the death penalty.

In evaluating the probability that Collier's jury would have rejected the death penalty, we must not forget to balance the aggravating and mitigating factors that would have been before the jury in the absence of his counsels' errors. *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2069. The district court held that even if defense counsel were ineffective in every way alleged in Collier's petition, Collier would be unable to demonstrate prejudice because:

> [t]he murder took place following an armed robbery; it involved a defendant who wrested a police officer's gun from him, shot one officer, and then turned and killed the officer whose gun he had taken; and the murder occurred in a rural community, where the murdered officer was widely known.

The first two factors listed by the district court generally represent the aggravating circumstances of Collier's murder conviction: he killed a police officer while trying to prevent his arrest for the commission of another felony. Although we do not underestimate the strength of these aggravating factors, we believe that there is at least a reasonable probability that a jury confronted with the stark contrast between Collier's acts on the day of the crimes and his history would not have voted for the death sentence. *See Dobbs,* 142 F.3d at 1390 (quoting *Jackson v. Herring,* 42 F.3d 1350, 1366 (11th Cir.1995), for the proposition that "[m]any death penalty cases involve murders that are carefully

planned, or accompanied by torture, rape, or kidnaping"). Had counsel presented the wealth of mitigating evidence that they gathered in preparation for the sentencing phase of the trial, *see supra* note 19, we believe there is a reasonable probability that consideration of these facts would have led the jury to a different result. *See Dobbs,* 142 F.3d at 1390-91 (affirming grant of the writ in case where evidence of "unfortunate upbringing" was not investigated by counsel and not presented during the sentencing phase of defendant's trial).

On the other hand, the third factor listed by the district court—that the murder occurred in a rural community where the officer was widely known—seems to suggest that the people of the community could not adequately put aside their anger about the crime to reach a detached and informed sentencing decision based on the aggravating and mitigating circumstances of the case. Although taking into account the righteous anger of the jurors at the killing of a person well-known to them might have given the district court a more accurate idea of whether a 1978 Catoosa County jury would have opted for a sentence of life imprisonment had they heard all of the mitigating evidence, such considerations run afoul of *Strickland.* "The assessment of prejudice should proceed on the assumption that the decisionmaker is *reasonably, conscientiously, and impartially* applying the standards that govern the decision." *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2068 (emphasis added). We must therefore assume that the jurors could put aside their passions and render a sentence based upon the aggravating and mitigating circumstances of the case as presented to them. Under such an assumption, we believe that the jury would have come to a different result.

In conclusion, we reiterate the Supreme Court's statement in *Strickland* that

the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable

38

because of a breakdown in the adversarial process that our system counts on to produce just results.

*Id.* at 696, 104 S.Ct. at 2069. By failing to seek expert testimony regarding the effect of Collier's diabetes upon his ability to control his behavior on the day of the crimes, and by failing to present evidence of Collier's background that would have mitigated his sentence, Collier's counsel precipitated a "breakdown in the adversarial process." The jury was called upon to determine whether a man whom they did not know would live or die; they were not presented with the particularized circumstances of his past and of his actions on the day of the crime that would have allowed them fairly to balance the seriousness of his transgressions with the conditions of his life. Had they been able to do so, we believe that it is at least reasonably probable that the jury would have returned a sentence other than death.

## III.

For the foregoing reasons, we hold that Robert Lewis Collier did not receive the effective assistance of counsel, as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, at the sentencing phase of his trial. We therefore AFFIRM the district court's denial of Collier's petition for a writ of habeas corpus with respect to his convictions, REVERSE the ruling of the district court denying Collier's petition for a writ of habeas corpus with respect to his sentence of death, and REMAND this case, with the instruction that the district court grant the writ of habeas corpus vacating Collier's sentence of death.

AFFIRMED in part, REVERSED in part, and REMANDED with instructions.

39