[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 97-2319
_____

D.C. Docket No. 3:95-cv-00250-J-10


JOHN GARY HARDWICK, JR.,

Petitioner - Appellant,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,

Respondent - Appellee.


_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(September 18, 2015)

Before TJOFLAT, HULL and MARTIN, Circuit Judges.

TJOFLAT, Circuit Judge:

In *Hardwick v. Crosby* (*Hardwick III*), 320 F.3d 1127 (11th Cir. 2003), we determined that Petitioner Hardwick was due an evidentiary hearing to determine whether his attorney provided ineffective assistance of counsel under the Sixth Amendment standard set out in *Strickland v. Washington,* 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), during the penalty phase of his capital murder trial. While retaining jurisdiction over the appeal, we remanded the case to the District Court for the limited purpose of conducting that hearing. The District Court held the hearing and found that the attorney's performance failed to meet *Strickland*'s standard. The court further found that, but for such failure, it was reasonably probable that Hardwick would not have been sentenced to death. The District Court therefore concluded that a writ of habeas corpus should issue as to the death sentence.

The District Court's findings and conclusion are now before for us for review. We review the District Court's legal conclusions *de novo* and its factual findings for clear error. *Turner v. Crosby*, 339 F.3d 1247, 1273 (11th Cir. 2003). The court's finding of ineffective assistance of counsel presents a mixed finding of fact and law, which we review *de novo. Collier v. Turpin,* 177 F.3d 1184, 1198 (11th Cir. 1998).

2

In the end, we agree with the District Court.  Hardwick is entitled to a writ of habeas corpus setting aside his capital sentence and, unless the State provides him with a new penalty phase, requiring the imposition of a life sentence.[1]

## I.

*Hardwick III* provides a highly detailed account of the facts and procedural history of Hardwick's case.  *See* 320 F.3d at 1131–58.  We recapitulate only those facts necessary to explain our disposition here.

Upset about the disappearance of his stash of quaaludes, Hardwick killed seventeen-year-old Keith Pullum in the early morning hours of December 24, 1984.  On March 13, 1986, after a three-day trial, Hardwick was convicted of first-degree murder.  At the penalty phase of the trial which followed, the State's case consisted of establishing five statutory aggravating circumstances, which, the prosecutor argued, warranted a death-sentence recommendation.[2]  The prosecutor laid the groundwork for the first statutory aggravating circumstance by introducing

---

[1]  Hardwick also asks us to address an argument on which we reserved judgment in *Hardwick III*: whether his relationship with his attorney was so dysfunctional that continued representation constituted a conflict of interest and denied Hardwick his right to effective representation of counsel during the guilt phase.  We find no merit in the argument and therefore reject it.  The District Court's original denial of relief on this claim is AFFIRMED.

[2]  To recommend the imposition of a death sentence in Florida in 1986, the jury was required to find: one or more of the enumerated aggravating circumstances set out in Fla. Stat. § 921.141(5); that sufficient mitigating circumstances outweighing the aggravating circumstances did not exist; and that the defendant should be sentenced to death.  *See id.* § 921.141(2) (1985).

3

Hardwick's three prior felony convictions "involving the use or threat of violence to the person." *See* Fla. Stat. § 921.141(5)(b) (1985).[3]  The prosecutor's arguments regarding the other four statutory aggravating circumstances were based on the evidence introduced during the guilt phase of the trial, and consisted of the following: Hardwick murdered Pullum while "kidnapping" him, *see id.* § 921.141(5)(d); the murder was committed for "pecuniary gain," *see id.* § 921.141(5)(f); the murder was "especially heinous, atrocious, or cruel," *see id.* § 921.141(5)(h); and the murder was committed in a "cold, calculated, and premeditated manner without any pretense of moral or legal justification," *see id.* § 921.141(5)(i).  Emphasizing the premeditated and cruel nature of the murder, the prosecutor told the jury that statutory mitigating factors did not exist to counter the aggravating circumstances.  The prosecutor added that "there isn't one shred of evidence that indicates" Hardwick was under the influence of emotional or mental disturbance and "[t]here is no evidence" that Hardwick's mind was impaired.

Hardwick's attorney did not call any witnesses or present any evidence during the penalty phase, in mitigation or otherwise.  His strategy was to present Hardwick's case solely via his closing argument to the jury.  That argument consisted of an attempt to undermine the statutory aggravating circumstances the

---

[3] All future references to Fla. Stat. § 921.141 refer to the 1985 version of the statute.

4

State presented and an appeal for mercy based on Hardwick's age (he was twenty-five at the time of the crime)[4] and the sanctity of human life. Rather than give the jury any mitigation evidence at all to consider, trial counsel's closing and rebuttal arguments reviewed again the evidence in keeping with the sufficiency-of-the-evidence defense. As noted in our prior opinion, trial counsel's "last statement to the jury in his rebuttal argument was notable for its lack of foundation: 'I think the evidence is clear and the lack of evidence even clearer that John Gary Hardwick is innocent of the crime of first degree murder.'" *Hardwick III*, 320 F.3d at 1150.

The jury returned a verdict recommending the imposition of a death sentence by a seven-to-five vote. At sentencing, the trial court found the five aggravating circumstances the State presented to the jury and no mitigating circumstances. Accordingly, the court sentenced Hardwick to death.

On direct appeal, despite holding two of the statutory aggravating circumstances found by the trial court—that the murder was committed during a kidnapping, and for pecuniary gain—to be erroneous, *Hardwick v. State* (*Hardwick I*), 521 So. 2d 1071, 1075 (Fla. 1988), *superseded on other grounds by rule*, Fla. R. Crim. P. 3.111, *as recognized in McKenzie v. State*, 29 So. 3d 272 (Fla. 2010), the

---

[4] One of the mitigating circumstances set out in Florida's capital sentencing scheme is "[t]he age of the defendant at the time of the crime." *Id.* § 921.141(6)(g).

5

Florida Supreme Court affirmed Hardwick's conviction and sentence, *id.* at 1077. That court concluded these errors were harmless because three valid statutory aggravating factors remained with no evidence of any mitigating circumstances in the record before it. *Id.* at 1076–77.

On February 16, 1990, Hardwick moved the trial court for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850. His motion included a claim that his trial attorney rendered ineffective assistance at the penalty phase by failing to adequately investigate and present available mitigation evidence of his deprived and abusive childhood, the mental and physical abuse he endured during his childhood and teen years, his dysfunctional family background of neglect and mistreatment, his long history of substance abuse, and his drug- and alcohol-induced impairment at the time of the murder. The court held three evidentiary hearings on Hardwick's claims and rejected them. The Florida Supreme Court affirmed that decision. *Hardwick v. Dugger* (*Hardwick II*), 648 So. 2d 100, 105 (Fla. 1994) (per curiam).

On March 20, 1995, Hardwick petitioned the United States District Court for the Middle District of Florida for a writ of habeas corpus setting aside his conviction and sentence under 28 U.S.C. § 2254. The District Court denied his petition on the record of the state courts' proceedings. We affirmed its decision with the exception of the conflict-of-interest claim, which we did not reach at that

6

time, *see supra* note 1, and the ineffective assistance claim now before us. *Hardwick III*, 320 F.3d at 1192.  We vacated the District Court's rejection of the latter claim because we concluded that "[t]he entirety of Hardwick's postconviction record under a *Strickland* analysis at least strongly suggests a reasonable probability that the result of the sentencing proceeding would have been different if competent counsel had presented and explained the significance of all the available evidence."  *Id.* at 1191 (quotation marks omitted).

In *Hardwick III*, we also stressed that trial counsel Tassone (1) "presented no mitigating evidence at the sentencing proceeding"; (2) did not obtain any school, medical, mental health, or juvenile justice records, or any social service records about Hardwick's foster home placements and abuse; (3) did not ask Dr. Barnard or anyone else to investigate or evaluate mitigation evidence relative to the sentencing phase; and (4) indeed failed "to investigate, obtain, or present *any* mitigating evidence to the jury, let alone the powerful mitigating evidence, including Hardwick's deprived and abusive upbringing."  *Id.* at 1167, 1171, 1173, 1189 (quotation marks omitted).  We previously concluded that trial counsel Tassone "appear[ed] to have given up on defending Hardwick and seemingly expended no effort, either in presentation of mitigating evidence or in understanding mitigation law."  *Id.* at 1189.  Tassone did not understand mitigation

7

law or the benefit to Hardwick at sentencing of having witnesses testify concerning mitigation evidence. *Id.* at 1191.

In *Hardwick III,* we also determined that Hardwick's family members were present during the trial each day and repeatedly offered to testify, and the reasons Tassone later gave for not calling family members as mitigation witnesses were not supported by the record. *Id.* at 1175-77. Dr. Barnard testified that if he had been asked to evaluate mitigation evidence, such as Hardwick's poor and abusive family life and its effect on his life, he would have been willing to do so. *Id*. at 1171-72.

Importantly too, the majority in *Hardwick III* expressly concluded that the state court's findings of fact on Hardwick's ineffective counsel claim were not supported by the record for various reasons. *Id.* at 1185 n.207.

Having found "the state [courts' Rule 3.850] findings and consequent legal conclusions relating to the penalty phase . . . untenable," *id.* at 1184 n.207, we remanded the case, instructing the District Court to consider "the statutory and nonstatutory mitigating evidence that [counsel] could have presented at the state [court] sentencing proceeding," *id.* at 1192; weigh "the totality of this mitigating

8

evidence . . . against the valid aggravating factors," *id.*; and "determine whether

Hardwick is entitled to habeas relief," *id.* at 93.[5]

We marked out a broad scope for the hearing, stating that "we d[id] not want

to inhibit the district judge in his conduct of an evidentiary hearing" on the issue of

ineffective assistance at the penalty phase. *Id.* at 1192 n.219. We directed the

District Court to evaluate

> the full exposition of Hardwick's deprived and abusive childhood and
> adolescence, including longstanding alcohol and drug dependency; his
> binge or extensive and consistent consumption of drugs and alcohol
> during the relevant time period of Pullum's homicide; and the
> testimony of examining experts as to the presence of statutory and
> nonstatutory mitigating factors, especially, his ability to conform his
> conduct to the dictates of law.

*Id.* We added that "to the extent that evidence at the federal hearing may exceed

that presented in state court, . . . Hardwick already has proffered specific facts that

overcome the procedural bar."[6] *Id.* We also specifically dictated that "the district

---

[5] The dissent disagreed with the majority opinion over whether certain state court
findings of fact were supported by the record. *Hardwick III*, 320 F.3d at 1193-97.

[6] As we explained in *Hill v. Jones*, 81 F.3d 1015, 1023 (11th Cir. 1996),

> [a] state habeas petitioner is not entitled to an evidentiary hearing in
> federal court on the merits of a procedurally defaulted claim unless he can first
> overcome the procedural bar. This requires showing either cause for failing to
> develop in state court proceedings the facts supporting his claim, and prejudice
> resulting from that failure, or a fundamental miscarriage of justice would result
> from failure to hold a federal evidentiary hearing.

*Id.* (citations and quotation marks omitted).

9

judge must consider the various affidavits . . . from the state 3.850 proceeding."

*Id.* at 1186 n.207.[7]

Pursuant to our instructions, the District Court held an evidentiary hearing

on February 17–19, 2009.  At the hearing, Hardwick called seven witnesses.  First,

three experienced capital defense attorneys testified as to the standard among

defense attorneys in the mid-1980s for investigating and presenting mitigation

evidence.  Next, Dr. Jethro Toomer, a clinical psychologist, testified about the use

of mental-health mitigation in the mid-1980s and explained the specific mitigating

evidence available in Hardwick's case.  Then Mary Braddy, a correctional officer

That standard was met in Hardwick's case, we explained, because "[Defense counsel's] failure to call defense witnesses Hardwick desired or to provide Hardwick *any defense* at the guilt or sentencing phase" provided cause, and "the seven/five jury recommendation for death, when knowledge and presentation of the applicable statutory and nonstatutory mitigating factors well may have resulted in one more vote that would have rendered a jury recommendation of life rather than death," constituted prejudice sufficient to excuse the default.  *Hardwick III*, 320 F.3d at 1192 n.219.

[7] As part of *Hardwick III*'s mandate, the District Court was bound to follow this instruction.  *Litman v. Massachusetts Mut. Life Ins. Co.*, 825 F.2d 1506, 1510–11 (11th Cir. 1987) (en banc) ("A district court when acting under an appellate court's mandate, 'cannot vary it, or examine it for any other purpose than execution; or give any other or further relief; or review it, even for apparent error, upon a matter decided on appeal; or intermeddle with it, further than to settle so much as has been remanded.'" (quoting *In re Sanford Fork & Tool Co.*, 160 U.S. 247, 255, 16 S. Ct. 291, 293, 40 L. Ed. 414 (1895)).  Thus, any argument that it was error for the District Court to rely on these affidavits is barred.  *See United States v. Amedeo*, 487 F.3d 823, 829–30 (11th Cir. 2007).  We decline to consider the State's belated attempt to identify an applicable exception to the mandate rule, made for the first time on appeal in a post-oral-argument letter submitted pursuant to Federal Rule of Civil Procedure 28(j).  *See Adkins v. Warden, Holman CF,* 710 F.3d 1241, 1246–47 (11th Cir.).

who interacted with Hardwick at the Duval County jail shortly after his arrest, testified as to her perception of his level of mental impairment at that time. Gary Hendrix, an investigator in the Public Defender's office who assisted with the investigation prior to Hardwick's Rule 3.850 motion in 1990, then testified about standard procedures involved in conducting a mitigation investigation. Finally, Hardwick's trial counsel testified about his reasons for not presenting any mitigating evidence during the penalty phase. The State called one witness, Dr. Ernest Miller, a psychiatrist, who testified as to the state of the field of mental health mitigation in the mid-1980s, particularly as it related to substance abuse and a diagnosis of antisocial personality disorder. In addition to this testimony, the District Court considered the record of the state court trial and post-conviction proceedings, and twenty-three exhibits introduced by the parties, including Hardwick's school, social services, and juvenile justice records; the reports of several mental health professionals; notes and billing records made by Hardwick's trial counsel; and affidavits from Hardwick's family and acquaintances that were introduced in the Rule 3.850 proceedings.

After conducting an evidentiary hearing and reviewing the record before it, the District Court found that counsel rendered ineffective assistance under *Strickland*. That is, the court found that counsel's performance fell below an objective standard of reasonableness and that, but for his deficient performance, it

11

was reasonably probable that Hardwick would not have been sentenced to death. The District Court entered a 111-page order with extensive findings of fact and conclusions of law.

## II.

Before beginning our discussion of the merits, we think it might be helpful to clarify the legal posture of Hardwick's case.

Because Hardwick filed his § 2254 petition prior to April 24, 1996, the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2241, *et seq.*, we apply pre-AEDPA law.  *Lindh v. Murphy*, 521 U.S. 320, 336–37, 117 S. Ct. 2059, 2068, 138 L. Ed. 2d 481 (1997); *Brownlee v. Haley*, 306 F.3d 1043, 1058 (11th Cir. 2002).  That Hardwick's appeal is not governed by AEDPA means that we are not constrained by AEDPA's "highly deferential" standard of review of state court adjudications.  *Lindh*, 521 U.S. at 333 n.7, 117 S. Ct. at 2066 n.7.  Under AEDPA, a federal court may only grant habeas relief to a state prisoner where the state court's adjudication of the petitioner's claim "was contrary to . . . Federal law" as clearly established by Supreme Court holdings, § 2254(d)(1); "involved an unreasonable application" of such law, *id.*; or "was based on an unreasonable determination of the facts" in light of the record before the state court, § 2254(d)(2).  Thus, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was

incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S. Ct. 1933, 1939, 167 L. Ed. 2d 836 (2007).

Under pre-AEDPA law, however, a federal habeas court decides questions such as whether habeas relief is warranted or whether counsel rendered ineffective assistance—i.e., pure questions of law and mixed questions of law and fact—independently of all prior adjudications. *See, e.g., Freund v. Butterworth*, 165 F.3d 839, 861 (11th Cir. 1999) (en banc) ("Questions of law and mixed questions of law and fact . . . mandate *de novo* review."); 2 Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice and Procedure*, § 32.1, at 1746 (6th ed. 2011) ("Until Congress' enactment of AEDPA, it was blackletter law that federal habeas courts were required to resolve all of the petitioner's legal claims *de novo* in the strictest sense of that term. Insofar as the petition presented questions of law or mixed questions of law and fact, the federal courts were required to treat the petition as a wholly new complaint, which originated an independent civil suit and deserved to be adjudicated from scratch—as if, in effect, a state court had not already adjudicated the same claims in the same case." (footnotes and quotation marks omitted)).

Accordingly, the District Court's task, now subject to our *de novo* review, was not limited merely to assessing the reasonableness of the state court's

13

application of the *Strickland* standard; rather, it was to apply *Strickland*'s standard directly.  *Cf. Harrington v. Richter*, 562 U.S. 86, 101, 131 S. Ct. 770, 785, 178 L. Ed. 2d 624 (2011) (stating that under AEDPA, "[a] state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself").

In contrast to determinations of law, under both AEDPA and pre-AEDPA law, state court *factual* findings are generally due a presumption of correctness. *Compare* 28 U.S.C. § 2254(e)(1), *and Schriro*, 550 U.S. at 473–74, 127 S. Ct. at 1939–40 ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with clear and convincing evidence." (quotation marks omitted)), *with Hardwick III*, 320 F.3d at 1158 (explaining that under pre-AEDPA law, "factual findings by a state court following a merits hearing on the claims raised generally are accorded a presumption of correctness" unless one of "the eight exceptions in former § 2254(d) apply").  That general rule does not hold here, however.

In *Hardwick III,* we found that several of the exceptions in the former § 2254(d) applied to the state court's factual findings regarding the penalty phase of Hardwick's trial, and therefore the state court factual findings "are not entitled to a presumption of correctness."  *See* 320 F.3d at 1158–59 n.141, *id.* at 1184 n.207 (finding some of the state court's findings unreliable in part because of the absence

14

of "a full, fair, and adequate hearing"; discounting others as "not fairly supported by the record"; and ultimately concluding that the state court's penalty-phase-related factual findings were "untenable," "not consistent with the record," and even "contradicted by the record"). As a result of our *Hardwick III* decision, there is no presumption of correctness as to those findings and the District Court was free to make its own findings of fact based on the record before it.[8]

The combined effect of these points—first, the District Court's obligation to resolve the legal issues surrounding Hardwick's claim without deference to any prior state court adjudications, which derives from the nature of the pre-AEDPA civil habeas suit, and second, the lack of any presumption of correctness due to the factual findings of the state court, as a result of our finding in *Hardwick III*—is that the District Court was effectively writing on a blank slate in adjudicating Hardwick's claim. We proceed with that understanding.

---

[8] The State asserts that on Hardwick's prima facie showing that the state court proceedings were not full, fair, and adequate, *Hardwick III* consigned the state court's factual findings to a kind of evidentiary purgatory. Since the testimony at the subsequent evidentiary hearing did not, in all respects, contravene the state court's findings, the State urges that the findings must now be revived and "given their due deference." We decline to adopt the State's novel position , especially in light of our prior opinion in *Hardwick III* concluding those fact findings were not fairly supported by the record or contradicted by the record.

III.

Hardwick asserts—and the District Court found—that he was denied his Sixth Amendment right[9] to the effective assistance of counsel when his attorney failed to investigate, discover, and present substantial mitigating evidence to the sentencing jury.  As set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), to establish a denial of this right, a habeas petitioner must show (1) "that counsel's performance was deficient"; and (2) "that the deficient performance prejudiced [his] defense."  *Id.* at 687, 104 S. Ct. at 2064.

A.

1.

Deficient performance is defined as "representation [that] f[alls] below an objective standard of reasonableness."  *Id.* at 688, 104 S. Ct. at 2064.  "[T]rial counsel's failure to present mitigating evidence is not per se ineffective assistance of counsel," *Stevens v. Zant*, 968 F.2d 1076, 1082 (11th Cir. 1992); it can, on occasion, be justified as a strategic choice, *e.g., Lightbourne v. Dugger*, 829 F.2d 1012, 1025 (11th Cir. 1987).  As a general matter, a high level of deference is accorded an attorney's strategic decisions.  *See, e.g., Strickland,* 466 U.S. at 690,

---

[9] The Sixth Amendment right to counsel in capital cases was incorporated against the States via the Due Process Clause of the Fourteenth Amendment in *Powell v. Alabama*, 287 U.S. 45, 71, 53 S. Ct. 55, 65, 77 L. Ed. 158 (1932).

16

104 S. Ct. at 2066 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . ."). However, a decision not to put on mitigating evidence is only reasonable, and thus due deference, to the extent it is based on a professionally reasonable investigation. *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S. Ct. 2527, 2535, 156 L. Ed. 2d 471 (2003).

Accordingly, the first question the District Court had to answer was "whether the investigation supporting counsel's decision not to introduce mitigating evidence of [Hardwick's] background was itself reasonable." *Id.*, 539 U.S. at 523, 123 S. Ct. at 2536 (emphasis omitted). This is an objective inquiry, as measured from counsel's perspective. *Id.* In other words, the District Court had to put itself in counsel's shoes, review the information of which he was or should have been aware, and determine what a reasonable attorney would have done under those circumstances. *Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066.

The Supreme Court has cautioned that a federal habeas court is to avoid concluding "that it is prima facie ineffective assistance for counsel to abandon their investigation of the petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *See Cullen v. Pinholster*, ___ U.S. ___, ___, 131 S. Ct. 1388, 1406–07, 179 L. Ed. 2d 557 (2011) (quotation marks and alterations omitted). "*Strickland* itself rejected the notion that the same

17

investigation will be required in every case." *Id.* Instead, "the *Strickland* test of necessity requires a case-by-case examination of the evidence." *Id.* at ___, 131 S. Ct. at 1407 n.17 (quotation marks omitted). Thus, in each case, it must be determined "whether counsel conducted a reasonable background investigation *or* made a reasonable decision that made conducting a background investigation unnecessary." *Johnson v. Sec'y, Dept. of Corr.*, 643 F.3d 907, 931 (11th Cir. 2011) (quotation marks omitted).

2.

The District Court found that Hardwick's attorney failed to conduct a professionally reasonable mitigation investigation under the circumstances. It did so based on its subsidiary findings about what counsel knew about Hardwick and his background, and what counsel then failed to do and learn about Hardwick and his childhood background.

The District Court found that the attorney was aware of a number of red flags, which—given his knowledge of Hardwick's grave legal situation—should have highlighted the need to conduct at least some life-history investigation and at least some mitigation investigation. Regarding Hardwick's legal situation, counsel testified that he believed Hardwick would be convicted of first-degree murder. He also knew that the State would likely seek the death penalty on the basis of several aggravating circumstances, and, if so, that the jury would be instructed that unless

18

the defense presented mitigation evidence sufficient to outweigh the aggravating circumstances, they must recommend a sentence of death.  Given these circumstances, counsel knew, or should have known, that Hardwick's defense in the penalty phase—specifically, the presence or absence of mitigating evidence—would be pivotal.

Hardwick's attorney was aware of potential sources of mitigating evidence. For example, from the outset of his representation, he had notes that an Assistant Public Defender had taken during a preliminary interview with Hardwick.[10]  These notes contained the names of Hardwick's parents and all ten of his siblings, three of the schools he had attended, contact information for a mental health evaluation center in South Carolina where Hardwick had been diagnosed with schizophrenia, a list of Hardwick's medications, and information that Hardwick had been using drugs and alcohol since the age of eleven or twelve.

Counsel also knew from speaking with Hardwick and his mother that his childhood was marked by neglect and physical and sexual abuse; and that he had spent a great deal of his youth in foster homes, in the care of social services, and in juvenile detention.  Moreover, counsel also knew from the pretrial deposition

---

[10] The Office of the Public Defender had originally been appointed to represent Hardwick, but had to recuse itself shortly thereafter upon discovering a conflict.

19

testimony of a number of witnesses that Hardwick had ingested a substantial amount of drugs and alcohol prior to the murder.

Additionally, counsel also had the benefit of an evaluation of Hardwick, performed by a court-appointed expert, Dr. George Barnard, a psychiatrist. The District Court found that "Dr. Barnard was appointed solely to evaluate Hardwick for competency and sanity, not for mitigation," and that Tassone did not discuss mitigation with Dr. Barnard. The District Court also found that Tassone did not provide Dr. Barnard with any pretrial depositions, any historical records, or even the limited background information obtained from the Public Defender's file. Trial counsel did not give Dr. Barnard any of Hardwick's life history. The District Court concluded that Dr. Barnard's report—though conducted solely for the purpose of evaluating Hardwick's sanity and competency to stand trial—was filled with "many red flags that [sh]ould have spotlighted the need for a mental health expert to evaluate the case for mitigation."

Dr. Barnard's report recounted Hardwick's description of the circumstances of the crime, including his heavy ingestion of marijuana, quaaludes, beer, and vodka prior to committing the murder, and a blow-by-blow account of how he had killed Pullum. The report also summarily gave a few pieces of Hardwick's family background. His father was an alcoholic; both of his parents were married and divorced multiple times; his mother, unable to care for him, placed him in a boys'

20

home for a year and a half when he was six; thereafter, when not in reform school or other juvenile institutions, he was shuttled between various parents and step-parents, several of whom subjected him to beatings and abuse.  Hardwick described how by the age of twelve or thirteen, he was using alcohol and various drugs on a regular, if not daily basis.  By the age of thirteen, he was experiencing blackouts due to alcohol abuse and had spent two weeks in the hospital after contracting hepatitis from a dirty needle.  Dr. Barnard's report concluded that Hardwick "me[t] the criteria . . . for multiple substance abuse [disorder] and for anti-social personality disorder," but that he was aware of his actions and their wrongfulness at the time of the offense —i.e., he was not insane at the time—and was competent to stand trial.

The District Court found that despite his awareness of this information, Hardwick's attorney did not conduct a life-history investigation or follow up on any leads.  He failed to obtain any of Hardwick's readily available life-history records, such as his school, medical, psychiatric, foster care, juvenile justice, or social-services records, even though the notes provided by the Assistant Public Defender clearly pointed him toward such information.  Other than Hardwick's mother, the attorney failed to ask any of Hardwick's family members about Hardwick's dysfunctional upbringing or extended history of substance abuse prior to trial, even though several family members were willing and available to testify

21

to these circumstances.[11]  And, critically, counsel failed to provide any of this information to Dr. Barnard or another mental health expert, or seek an opinion as to the presence of mitigating evidence or evidence that might undermine one or more of the aggravated circumstances the State would be relying on, despite the availability of mental health experts who could have rendered such an opinion.

The District Court concluded that the combination of these factors—counsel's awareness of information signaling the presence of significant mitigation lying just beneath the surface and his failure to perform even a rudimentary amount of investigating—led ineluctably to the finding that counsel's performance was deficient.

We agree.  Under the prevailing professional norms at the time of Hardwick's trial in 1986, defense attorneys in capital cases had a clear "obligation to conduct a thorough investigation of the defendant's background."  *See Williams v. Taylor*, 529 U.S. 362, 396, 120 S. Ct. 1495, 1515, 146 L. Ed. 2d 389 (2000) (citing 1 ABA Standards for Criminal Justice 4-4.1, cmt. (2d ed. 1980)); *cf. Porter v. McCollum*, ___ U.S. ___, ___, 130 S. Ct. 447, 452, 175 L. Ed. 2d 398 (2009)

---

[11] The District Court noted that counsel testified that he had several conversations with one of Hardwick's brothers after the start of Hardwick's trial, but he acknowledged that he had no contact with the brother pretrial.  Counsel also testified that he tried to speak with Hardwick's fifteen-year-old wife, but abandoned the attempt when it became clear that she was not going to be a reliable witness.

(per curiam) ("It is unquestioned that under the prevailing professional norms at the time of [the 1988] trial, counsel had an obligation to conduct a thorough investigation of the defendant's background." (quotation marks omitted)).

As we have noted in the context of pretrial guilt-phase investigations, the obligation to conduct a reasonable investigation does not require defense counsel to "discern every possible avenue which may hurt or help the client," but it does require counsel to "make an effort to investigate the obvious." *House v. Balkcom*, 725 F.2d 608, 618 (11th Cir. 1984).  Thus, for example, the Supreme Court held in *Williams v. Taylor* "that counsel's failure to uncover and present voluminous mitigating evidence at sentencing could not be justified as a tactical decision to focus on Williams' voluntary confessions, because counsel had not 'fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background.'" *Wiggins*, 539 U.S. at 522, 123 S. Ct. at 2535 (quoting *Williams*, 529 U.S. at 396, 120 S. Ct. at 1515).

Here, Hardwick's attorney had ample information signaling the existence of potential significant mitigation evidence.  He knew that Hardwick had been raised in an abusive environment and has been in and out of foster and boys' homes; knew that Hardwick had been abusing drugs and alcohol for over a decade; and knew of Hardwick's particularly heavy usage of quaaludes, marijuana, and alcohol immediately prior to the murder.  Counsel was also aware of witnesses who would

23

have provided documentary and testimonial support for these facts.  As the District Court found, reasonable capital defense attorneys at the time would have pursued these avenues of mitigation by seeking Hardwick's life-history records and interviewing his family members, and then by providing this information to Dr. Barnard or another mental health expert pursuant to a mental health mitigation evaluation.

This information should have highlighted for counsel the need for at least some mitigation investigation and a mitigation-focused evaluation by Dr. Barnard or another mental health expert.  Unfortunately, it did not.  The record fully supports the District Court's findings that counsel did not obtain any of Hardwick's life-history records or conduct a life-history investigation, much less even a rudimentary mitigation investigation.  The District Court properly concluded that counsel's performance fell below the objective standard of reasonableness required by the Sixth Amendment.

3.

In opposition, the State summarily declares that counsel "conducted a reasonable investigation."  But the State cannot dictate reality by fiat.  The State offers virtually nothing to counter the District Court's factual findings that counsel obtained no life-history records, had very little contact with Hardwick's family regarding potential mitigation testimony, and, having been put on notice about the

24

presence of potential mental health-related mitigators in Hardwick's background, failed to conduct any mitigation investigation or to request a mitigation evaluation from Dr. Barnard or another mental health expert. These findings are not clearly erroneous; thus the District Court did not err in concluding that the investigation was unreasonable.

The State spends the bulk of its rhetorical energy constructing arguments founded on the assumption that the relevant issue is whether counsel's failure to present mitigation evidence during the sentencing phase constituted deficient performance. First, the State contends that counsel made a reasonable strategic decision not to put on any evidence of Hardwick's childhood background or his substance abuse. In light of Hardwick's criminal history, his diagnosis of antisocial personality disorder, and the prosecution's attempt to paint Hardwick as a drug enforcer, the State argues, counsel reasonably decided not to add fuel to the fire by parading Hardwick's checkered past before the jury. Second, the State maintains that counsel's decision not to put on any mitigation case whatsoever was due in part to the refusal of Hardwick's mother and brother to testify at the penalty phase. Lacking his star witnesses, counsel's decision not to put on a mitigation case must have been reasonable. Finally, the State argues that Hardwick told counsel that he did not want any witnesses presented in the penalty phase. In

25

following Hardwick's explicit command, counsel could not have been acting unreasonably.

As a preliminary matter, the District Court made fact findings that undermine all of the State's arguments. For example, the District Court found that Hardwick's mother and brother "adamantly denied Tassone's assertions that they were not willing to testify" and testified they were present at trial and willing to testify. The District Court found them "credible" and expressly found they "were available and willing to testify on Hardwick's behalf." [12] As discussed more later, the District Court also found that Hardwick "would have permitted [counsel] to introduce some mitigation evidence."

Furthermore, the fatal flaw in all of the State's arguments is that the reasonableness of counsel's decision whether to present mitigation evidence is not the relevant issue at this point. The District Court's "principal concern in deciding whether [Hardwick's attorney] exercised 'reasonable professional judgmen[t],' [was] not whether counsel should have presented a mitigation case. Rather, [the] focus [was] on whether the investigation supporting counsel's decision not to

---

[12] This Court in *Hardwick III* also already rejected this contention. *See Hardwick*, 320 F.3d at 1185 n.207 (Tassone's claims about Hardwick's mother are "inconsistent with the record evidence of [her] actions, such as attending his trial daily, and their care and concern for each other, demonstrated by such examples as Hardwick's going to her home to wish her a Merry Christmas, even in a very drunk and drugged state, and her visiting him regularly in prison.")

26

introduce mitigating evidence of [Hardwick's] background *was itself reasonable.*" *See Wiggins*, 539 U.S. at 522–23, 123 S. Ct. at 2536 (citation omitted) (quoting *Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066). Even were we to credit all of the State's arguments, this would not somehow transform counsel's unreasonable investigation into a reasonable one. For example, here the District Court found that counsel failed to obtain any life-history records at all and failed to conduct any life-history investigation at all. Given all of the fact findings made by the District Court, the scope of counsel's investigation was thus unreasonably limited, the District Court did not need to go further to find deficient performance under *Strickland.* Nor do we.

### B.

We thus turn to the District Court's finding of *Strickland* prejudice. To prevail under *Strickland*'s second prong, Hardwick had to demonstrate that but for counsel's deficient performance, "there is a reasonable probability he would have received a different sentence." *See Porter*, 558 U.S. at 41, 130 S. Ct. at 453. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. That probability is assessed by considering "'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding'—and 'reweighing it against the evidence in aggravation.'" *Porter*, 558 U.S. at 41, 130

27

S. Ct. at 453–54 (alteration omitted) (quoting *Williams*, 529 U.S. at 397–98, 120 S.

Ct. at 1515).

For example, the District Court found that trial counsel failed to obtain any

life-history records and failed to conduct any life-history investigation, even

though Hardwick had been in boys' homes and foster homes and had had mental

problems, including a diagnosis of schizophrenia, and even though such records

were readily available from schools, jails, a medical center, and several social

service agencies that had interacted with Hardwick.

Ultimately, the focus of our inquiry is the fundamental fairness of the

sentencing proceeding. *Strickland*, 466 U.S. at 696, 104 S. Ct. at 2069.  If we

adjudge that the result of that proceeding "is unreliable because of a breakdown in

the adversarial process," we must affirm. *See id.* at 696, 104 S. Ct. at 2069.

1.

The District Court found it "abundantly evident that statutory and

nonstatutory mitigating factors existed that [counsel] should have presented to

provide Hardwick a defense at sentencing and to make a case for sparing his life."

First, and foremost, the District Court found that had counsel presented the

evidence a professionally reasonable investigation would have uncovered, counsel

could have argued as a statutory mitigating circumstance that, at the time of the

murder, Hardwick's capacity "to conform his conduct to the requirements of the

28

law was substantially impaired." *See* Fla. Stat. § 921.141(6)(f). This finding is amply supported by the record.[13]

The length and magnitude of Hardwick's substance abuse and dependency are well-established. At the time of the murder, Hardwick had been sniffing, smoking, injecting, drinking, or otherwise ingesting a wide variety of drugs and alcohol on a regular basis for more than half of his twenty-five years. Hardwick had already begun his alcohol and drug use by age twelve. His mother neglected him and placed him in a boys' home at age seven, but he repeatedly ran away and returned to his physically abusive father who gave him drugs and alcohol to keep him occupied. By age thirteen, Hardwick was having alcohol-induced blackouts and contracted hepatitis from dirty intravenous needles. In 1974, at age fifteen, Hardwick attempted suicide twice; first by drug overdose, and then by slashing his wrists. Dr. Toomer opined at the evidentiary hearing that when substance abuse

---

[13] The District Court also found that had counsel conducted a reasonable investigation, counsel would have discovered evidence implicating two additional statutory mitigating circumstances: that Hardwick acted "under the substantial domination of another person"; and that he committed the murder "while . . . under the influence of extreme mental or emotional disturbance." *See* Fla. Stat. § 921.141(6)(e), (b). The District Court grounded its finding regarding the presence of the substantial-domination mitigator in Dr. Levin's Rule 3.850 hearing testimony that Hardwick had admitted to him that another individual was present while the crime was being committed, and that the other individual encouraged Hardwick to complete the job of killing Pullum. As for the extreme-mental-disturbance mitigator, the District Court appears to have credited testimony by Dr. Barnard at the Rule 3.850 hearing that during the weekend on which the murder occurred, Hardwick's wife told him that she was going to leave him. We find the presence of the substantial-impairment mitigator sufficient to support our disposition and thus focus our attention accordingly.

29

begins at such a young age and occurs for an extended period of time, it generally results in significant psychological and functional impairment.  In his words, the end is result is "an individual who is unable to function effectively, i.e., in terms of what we call executive functioning[:] weighing alternatives, projecting consequences, managing what we call high order thought . . . ."

The record is also uncontroverted as to Hardwick's heavy intake of drugs and alcohol around the time of the murder.  Several of his associates averred that they saw him taking quaaludes, smoking marijuana, and drinking vodka the day before the murder.  At least one witness described him sweating heavily, shaking, and acting erratically shortly after the murder occurred; another recalled that his speech was incoherent and slurred.  Correctional officer Mary Braddy saw Hardwick shortly after his incarceration, two days after the murder, and testified that he did not appear to be aware of her presence, his eyes were glassy and vacant, and he appeared to be either high or intoxicated.

As pointed out in our *Hardwick III*, Dr. Levin considered that during the five days leading to his offense Hardwick "ingested forty or fifty [ ] Quaaludes, continually smoked marijuana, drank a fifth of vodka, and shared a couple of cases of beer with friends."  Darlene Hardwick observed that Hardwick was intoxicated during those five days and Hardwick got "little sleep during this period."  Dr. Dee,

30

who also interviewed Hardwick, concluded that Hardwick was "acutely intoxicated" at the time of the offense.

Dr. Toomer testified, based on his personal evaluation of Hardwick before the evidentiary hearing in federal court, and his review of the witness accounts of Hardwick's intoxicated condition at the time of the crime, and the life-history records detailing Hardwick's history of drug and alcohol abuse, that Hardwick's ability to conform his conduct to the requirements of the law was substantially impaired at the time of the murder. In reaching this conclusion, Dr. Toomer echoed the opinions of the mental health experts in the state Rule 3.850 proceedings, Dr. Barnard, Dr. Levin, and Dr. Dee. Each of these experts concluded, based on the postconviction evidence outlined above, that Hardwick's capacity to conform his conduct to the requirements of the law was substantially impaired at the time of the offense. Dr. Toomer further testified that had he been provided with the witness accounts of Hardwick's condition at the time of the murder and Hardwick's extensive life-history records, and asked to render an opinion as to the presence of this statutory mitigating factor at the time of Hardwick's trial, he would have been able to answer affirmatively.

Reviewing this evidence, we cannot say that the District Court erred in finding that, but for counsel's failure to conduct a reasonable investigation, this statutory mitigating circumstance could have been argued to the jury. As Dr.

31

Toomer explained, and as documented by the extensive life-history records, Hardwick was already suffering from significant psychological and functional impairment due to his early and extended exposure to drugs and alcohol—not to mention the physically abusive and deprived childhood and the extensive family trauma that precipitated his substance abuse.  When compounded by his holiday drug and alcohol binge, it seems highly likely that Hardwick's capacity to conform his behavior to societal standards was substantially impaired at the time of the murder.  *See Brownlee*, 306 F.3d at 1070 (noting the defendant's pre-existing intellectual and psychiatric impairment and concluding that "[d]rug or alcohol use on the day of the crime would have substantially aggravated these pre-existing limitations").

The District Court then turned to nonstatutory mitigation.  Citing the aforementioned evidence of Hardwick's background, the District Court concluded that "Hardwick's turbulent family history, dysfunctional upbringing, mental/physical abuse and early alcohol/drug use and addiction" constituted compelling mitigating circumstances that would have supported a life sentence.

Having thoroughly reviewed the record, we are in agreement with the District Court's conclusion.  Lay witness accounts, evaluations by mental health experts, and Hardwick's life-history records all tell a clear, consistent tale of abuse, neglect, and dysfunction.  Hardwick's father was an alcoholic and physically

32

abusive of both Hardwick's mother and Hardwick himself—to the point of wrenching Hardwick's shoulder out of its socket on one occasion. Another time Hardwick's father beat his son "with a belt so badly that the blood came up to the skin." Hardwick's father also would "take his shoe and kick [Hardwick] with it." Hardwick's family lived in poverty because his father, a severe alcoholic, spent much of his money on alcohol and could not maintain a job. Hardwick's family lived in substandard housing, moved frequently, and did not have adequate food and clothing. His father beat his mother, leaving cuts, bruises, and black eyes. His mother was emotionally detached and unable to provide the attention, discipline, and care Hardwick needed. After his parents divorced when he was four, Hardwick was frequently left to fend for himself during his pre-teen years, sometimes hitchhiking alone between his father's house in South Carolina and his mother and step-father's residence in Florida. Neither location was safe: his mother neglected him to avoid triggering her new husband's jealous rage, and his father would beat him. At age seven, Hardwick was placed in a boys' home because his mother was pregnant again and could not take care of him. Hardwick repeatedly ran away from the institution to return to his abusive father in South Carolina. Eventually, social services found the father's home unfit and placed Hardwick in a foster home. Hardwick's mother had a total of eleven children with three different husbands and never took care of Hardwick either. By the age of

33

eleven, Hardwick had begun drinking alcohol, sniffing glue, and smoking marijuana. Over the course of his teenage years, Hardwick was in and out of juvenile institutions for a variety of theft and drug-related offenses. His institutional records include reports of depression, mood swings, and multiple suicide attempts. At one point, Hardwick was diagnosed with schizophrenia and the records show his medications included Thorazine, Sinequan, and Elavil. In sum, there is ample evidence of "the kind of troubled history [the Supreme Court] ha[s] declared relevant to assessing a defendant's moral culpability." *See Wiggins*, 539 U.S. at 535, 123 S. Ct. at 2542.

The jury and the trial judge, however, heard none of it. Counsel's failure to investigate and present even the least bit of this powerful mitigating evidence enabled the prosecutor to emphasize repeatedly in closing arguments that there were no mitigating circumstances in Hardwick's case. For instance, the jury was told "there is absolutely no evidence . . . that the defendant's mind was impaired or that he was out of control. . . . There is no evidence that has been presented to you for you to conclude that . . . this mitigating circumstance applies. That mitigating factor does not apply . . . ." We are left with the distinct sense that, had the jury been presented with this copious and powerful mitigating evidence a reasonable investigation would have uncovered, there is at least a reasonable probability that Hardwick would not have received a death sentence.

34

2.

The State raises several points that, it contends, demonstrate that Hardwick was not prejudiced by counsel's deficient performance. First, the State argues that the District Court did not give proper weight to the aggravating circumstances. Second, the State argues that the District Court overlooked the harmful effects that would have flowed from the introduction of this mitigating evidence. Third, the State posits that a finding of prejudice is precluded by Hardwick's instruction to counsel not to present any mitigation evidence at the penalty phase. We address each argument in turn.

a.

The State correctly observes that the District Court was required to place both the aggravating circumstances and the mitigating circumstances in the scales to appropriately weigh them. *See Collier v. Turpin*, 177 F.3d 1184, 1203 (11th Cir. 1998) ("In evaluating the probability that Collier's jury would have rejected the death penalty, we must not forget to balance the aggravating and mitigating factors that would have been before the jury in the absence of his counsels' errors."). The State argues that the aggravating circumstances present in this case are so weighty that the addition of the mitigating evidence the District Court identified would have made no difference in the jury's recommendation or Hardwick's ultimate sentence. In a related vein, the State also asserts that the District Court erred in

35

finding that the mitigating evidence would have undermined the weight of the aggravating circumstances found by the sentencing judge.  We disagree with both assertions.

The Florida Supreme Court held that the sentencing judge properly found three aggravating circumstances in Hardwick's case: (1) that Hardwick had prior violent felony convictions; (2) that the murder was heinous, atrocious and cruel ("HAC"); and (3) that the murder was cold, calculated, and premeditated ("CCP"). *Hardwick I,* 521 So. 2d at 1076–77.  The State notes that these aggravators have been characterized by the Florida Supreme Court as being among the most serious aggravating circumstances.  *See, e.g., Brown v. State*, 143 So. 3d 392, 405 (Fla.) (per curiam), *cert. denied*, 135 S. Ct. 726, 190 L. Ed. 2d 453 (2014) ("This Court has consistently recognized that CCP and HAC are two of the weightiest aggravators in Florida's statutory sentencing scheme."); *Hodges v. State*, 55 So. 3d 515, 542 (Fla. 2010) (per curiam) ("Qualitatively, prior violent felony and HAC are among the weightiest aggravators set out in the statutory sentencing scheme.").

We do not quibble with the State's characterization of Florida law, but whether one aggravator is weightier than another in the abstract, does not resolve whether here, on the facts of this case, with the mitigation and aggravation present in these circumstances, there is a reasonable probability that the jury would have reached a different balance.  The District Court was convinced that had the jurors

36

been presented with the weight of this strong and extensive mitigation evidence hidden beneath the surface of this case, there is at least a reasonable probability that they would have recommended a different sentence—and that the judge would have heeded their recommendation. Having reviewed the District Court's conclusion *de novo*, we are similarly convinced.

The strength of our conclusion takes into account not only the affirmative mitigating effect of that evidence, but also what might be termed the negative mitigating effect of the evidence. The District Court found that the evidence establishing the mitigating factors would also likely have lessened the weight the jury would have assigned to each of the three aggravating factors. While we disagree with the District Court on one or two points, we agree that the copious and powerful mitigation evidence likely undermines at least two of the aggravating factors.

As to the first aggravating circumstance, the District Court observed that one of the three prior convictions relied on by the sentencing court—a North Carolina conviction for assault with a deadly weapon—was actually classed as a misdemeanor in North Carolina, and thus did not appear to qualify as a prior violent felony. To the extent that Hardwick contends that the prior-violent-felony aggravator can be entirely negated on this basis, we cannot agree. Even assuming

37

that the North Carolina conviction is not eligible for the aggravator,[14] Hardwick's

felony convictions for armed robbery and  kidnapping remain.  Either would

suffice to establish the prior-violent-felony aggravator.[15]

We think it relevant, however, that the criminal acts underlying these two

convictions occurred less than twenty-four hours after Pullum's murder—which, as

---

[14] Although Hardwick was convicted of misdemeanor assault with a deadly weapon under North Carolina law, the analogous offense was considered a third-degree felony under Florida law.  *Compare State v. O'Briant*, 258 S.E.2d 839, 842 (N.C. Ct. App. 1979) (explaining that the misdemeanor offense of assault with a deadly weapon is a lesser included offense of the felony of assault with a deadly weapon with intent to kill (citing N.C.G.S. 14-33(b)(1)), *with* Fla. Stat. § 784.021 (defining the felony offense of aggravated assault as an assault with a deadly weapon without intent to kill).

It is clear that the North Carolina conviction could not now be considered for the purposes of the prior-violent-felony aggravator under Florida law.  *See Carpenter v. State*, 785 So. 2d 1182, 1205 (Fla. 2001) (per curiam) ("[W]e determine that an out-of-state conviction related to an offense that has only similar but different elements and does not constitute a "felony" in that state does not amount to a felony in Florida as a matter of law for the purposes of establishing the prior violent felony aggravating circumstance under the present statute.").  The state of the law on this point at the time of Hardwick's trial in 1986 is less clear, however.  *See id.* at 1204 (noting that the question was "an issue of first impression").  The State points out that in 1985, the Florida Supreme Court had explained that "whether a previous conviction . . . constitutes a felony involving violence under [the statute listing aggravating circumstances], depends on the *facts* of the previous crime."  *Johnson v. State*, 465 So. 2d 499, 505 (Fla. 1985), *overruled on other grounds by In re Instructions in Criminal Cases*, 652 So. 2d 814 (Fla. 1995) (per curiam) (emphasis added).  We express no opinion as to the resolution of this issue.

[15] Even though the two offenses occurred later in time than the murder, the *convictions* were handed down prior to Hardwick's murder trial.  These two convictions could thus be counted for the purposes of the prior violent felony conviction aggravator.  *See* Fla. Stat. § 921.141(5)(b) ("The defendant was previously *convicted* of . . . a felony involving the use or threat of violence to the person.") (emphasis added); *King v. State*, 390 So. 2d 315, 320 (Fla. 1980) (per curiam) ("The legislative intent is clear that any violent crime for which there was a conviction at the time of sentencing should be considered as an aggravating circumstance."), *receded from on other grounds by Strickland v. State*, 437 So. 2d 150 (Fla. 1983).

we have just explained, was committed while Hardwick's ability to conform his conduct to the requirements of the law was substantially impaired due to his substance abuse disorder and his contemporaneous, heavy drug and alcohol use for four or five days constantly around the time of the murder. *See supra*, Part III.B.1. Thus, we agree with the District Court that the weight of the prior violent felony aggravator would likely have been diminished somewhat in the eyes of the jury had they been made aware of the facts underlying Hardwick's impairment.

As to the HAC and CCP aggravators, the District Court concluded that "[b]oth relate to Hardwick's mental state, and thus both are undermined by the post-conviction mental health evidence." We agree with respect to the CCP aggravator; had the jury known about Hardwick's longstanding mental health issues and substantial drug- and alcohol-induced impairment at the time of the murder, they may indeed have attributed less weight to the State's assertion that the murder was the result of heightened premeditation. *See Gorham v. State*, 454 So. 2d 556, 559 (Fla. 1984) (per curiam) ("[CCP] applies only to crimes which exhibit a heightened premeditation, greater than that required to establish premeditated murder."). We disagree, however, with the District Court's conclusion that the weight of the HAC aggravator is directly linked to Hardwick's mental state. In 1984, the Florida Supreme Court explained that "heinous, atrocious, or cruel pertains more to the nature of the killing and the surrounding

39

circumstances while cold, calculated, and premeditated pertains more to state of mind, intent, and motivation." *Stano v. State*, 460 So. 2d 890, 893 (Fla. 1984); *see also Hardwick I*, 521 So. 2d at 1077 ("The factor of heinous, atrocious and cruel arises from the means actually employed in the killing; the factor of cold, calculated and premeditated refers to the degree of calculation and planning that preceded the killing."). We do not find this error to be dispositive, however; we are aware of no requirement that the weight of each aggravating circumstance be appreciably lessened in order to move the needle on the scale.

In sum, the evidence counsel failed to investigate and introduce would have had the dual effect of substantially strengthening the mitigation case and appreciably weakening the aggravation case. "Had the judge and jury been able to place [Hardwick's] life history on the mitigating side of the scale, and appropriately reduced the ballast on the aggravating side of the scale, there is clearly a reasonable probability that the advisory jury—and the sentencing judge— would have struck a different balance . . . ." *See Porter*, 558 U.S. at 42, 130 S. Ct. at 454 (quotation marks omitted).

b.

The State's second argument regarding prejudice is that the District Court erred by failing to afford sufficient weight to the negative aspects of the mitigation evidence an effective attorney would have put on. The State argues that if

40

Hardwick's attorney had introduced evidence of Hardwick's traumatic childhood, history of substance abuse, and use of drugs and alcohol before the murder, the prosecution would have exploited the countervailing aspects of that evidence, such as the voluntary nature of Hardwick's substance abuse and his diagnosis of antisocial personality disorder. The State submits that had that happened, the net effect would not have been mitigating, but aggravating.

We do not believe that the District Court erred in determining that the potentially harmful aspects of the evidence of Hardwick's personal history, especially his deprived and abusive childhood and his substance abuse given its early onset at age eleven or twelve in that childhood environment, were insufficient to outweigh its beneficial effect. It is true that this court has frequently noted the double-edged nature of evidence of drug and alcohol abuse. *See, e.g., Suggs v. McNeil*, 609 F.3d 1218, 1231 (11th Cir. 2010) (citing cases). Indeed, this Court has also said that an antisocial personality disorder is more harmful than mitigating. *Reed v. Sec'y, Fla. Dep't of Corr.*, 593 F.3d 1217, 1248 (11th Cir. 2010). Here, however, the cornerstone of the State's theory in both the guilt and penalty phases of the trial was that Hardwick was a hardened drug dealer who executed Pullum for stealing a large quantity of drugs from him. *See* Trial Transcript 286–87 (State's opening argument at guilt phase) ("[D]efendant murdered Keith Pullum because . . . defendant thought that Keith Pullum had

41

stolen his drugs, had stolen his Quaaludes, his valuable Quaaludes . . . ."); *id.* at 975 (State's closing argument at penalty phase) ("[D]efendant was a drug dealer. His business was dealing drugs. He killed Keith Pullum because he thought Keith Pullum had stolen his drugs and had interfered in his business of selling drugs. This defendant was a drug dealer."). The jury was repeatedly reminded that Hardwick and his associates were involved in drugs and that the murder was ancillary to Hardwick's drug business. *See, e.g.,* Trial Transcript 863 ("Again, remember, the defendant is a drug dealer . . . ."); *id.* at 864 ("I'm not saying [Hardwick's neighbor] Michael Hyzer is the type of person you want to live next door to. He seemed to be a little rough. He was a convicted felon and he was obviously involved in drugs. He bought the Quaaludes from the defendant."); *id.* at 851 ("[T]he only evidence of the defendant ever doing any work or anything that ever made any money or might make money was what? He sold drugs. I would submit to you that the defendant's motive in this case went to his very livelihood; the effect of those drugs.").

Under these particular circumstances, evidence of Hardwick's substance abuse would not have come as a shock to the jurors, further prejudicing them against him. Instead, presenting Hardwick's lengthy history of substance addiction, along with his deprived and physically abusive childhood, his alcoholic father and neglectful mother who abandoned him, his family poverty and

42

instability, his placement in a boys' home at age seven and later in foster homes, his early onset of alcohol and drug abuse at age eleven or twelve, his diagnosis of schizophrenia, his suicide attempts, and the many aspects of his traumatic family background that precipitated it, would have provided the jury with a more complete understanding of how Hardwick ended up where he did.  All they had was a brief snapshot of the instant Hardwick's life hit rock bottom; absent was the decades-long slide of childhood neglect, abandonment, abuse, instability, mental and emotional problems, intoxication, and addiction that led up to that moment.

Further, while we acknowledge that disclosure of Hardwick's diagnosis of antisocial personality disorder to the jury would not have helped his case, we cannot say that this factor, standing alone, would have nullified the cumulative mitigating effect of all of the unintroduced, but powerful, mitigation evidence about Hardwick's dysfunctional and abusive childhood.  The District Court did not err in deciding that this diagnosis "was not justification for [counsel's] failure to present mitigating evidence through a mental health expert."

c.

Finally, the State contends that counsel's recollection that Hardwick instructed him not to call any mitigation witnesses in the penalty phase precludes a finding of prejudice.  In support of this proposition, the State relies on *Schriro v. Landrigan*, 550 U.S. 465, 127 S. Ct. 1933, 167 L. Ed. 2d 836 (2007).  In that case,

43

Landrigan explicitly and repeatedly informed the trial court at sentencing that he did not wish to put on any mitigating evidence—even going so far as to interrupt his counsel's attempt to proffer evidence to which the mitigating witnesses would have testified. *Id.* at 469–70, 127 S. Ct. at 1937–38. Landrigan made this decision even though his attorney "had carefully explained to Landrigan the importance of mitigating evidence," and explicitly told him that "as counsel, he had a duty to disclose any and all mitigating factors to the court for consideration regarding the sentencing." *Id.* at 479, 127 S. Ct. at 1943 (alterations and quotation marks omitted).

The Supreme Court, applying AEDPA, held that the state court's factual finding "that Landrigan refused to allow the presentation of *any* mitigating evidence was a reasonable determination of the facts." *Id.* at 477, 127 S. Ct. at 1941 (emphasis added). Accordingly, the Court held that the Ninth Circuit erred in concluding that the District Court abused its discretion in deferring to the state court's determination that Landrigan could not demonstrate prejudice under *Strickland*. *Id.* at 477, 127 S. Ct. at 1942.

As Hardwick correctly points out, *Schriro*'s reasoning does not apply here. Contrary to the facts in *Schriro*, the unambiguous conclusion of the District Court—the relevant factfinder here, *see supra,* Part II—is that had counsel "investigated the many red flags" in Hardwick's case, presented this potentially

44

mitigating evidence to Hardwick, and explained that this evidence could be used to make a compelling case for life, Hardwick "would have permitted [counsel] to introduce *some* mitigation evidence." On the record before us, we cannot say that this factual finding is clearly erroneous. Moreover, as the District Court also found, Hardwick's actions, including his continued efforts to seek a life sentence, further support this finding.

3.

"The purpose of a sentencing hearing is to provide the jury with the information necessary for it to render an individualized sentencing determination based upon the character and record of the individualized offender and the circumstances of the particular offense." *Collier*, 177 F.3d at 1203 (alterations omitted) (quoting *Dobbs v. Turpin*, 142 F.3d 1383, 1386–87 (11th Cir. 1998)). Here, "counsel's absolute failure to investigate, obtain, or present any evidence, let alone the powerful, concrete, and specific mitigating evidence that was available, prevented the jurors from hearing anything at all about the defendant before them. An individualized sentence, as required by the law, was therefore impossible." *Brownlee*, 306 F.3d at 1074.

Because of counsel's deficient performance, the jury saw only a drug dealer who brutally killed someone for stealing his quaaludes. They did not hear a word about Hardwick's traumatic childhood background that was consistently marked

45

by neglect, deprivation, abandonment, violence, and physical and sexual abuse. They never had a chance to examine the trove of documents evidencing his decade-and-a-half long history of drug and alcohol addiction starting at the young age of eleven or twelve. They heard none of the affirmative evidence of his heavy intoxication at the time of the crime. Nor did they hear expert testimony about how these factors combined to render Hardwick substantially unable to conform his conduct to the requirements of the law, as the postconviction mental health experts unanimously concluded.

Yet even without this evidence, the jury still came within a single vote of recommending life.[16] *See Wiggins,* 539 U.S. at 537, 123 S. Ct. 2543 ("Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance."); *Cave v. Singletary*, 971 F.2d 1513, 1519 (11th Cir. 1992) (noting in its discussion of prejudice that "despite the presentation of no mitigating circumstances, Cave came within one vote of being spared execution."); *cf. Blanco v. Singletary*, 943 F.2d 1477, 1505 (11th Cir. 1991) ("Given that [four

---

[16] "In Florida, a vote of six jurors for life constitutes a recommendation against the death penalty." *Cave v. Singletary*, 971 F.2d 1513, 1519 (11th Cir. 1992). Given the jury's seven-to-five vote here, if only one additional juror had been persuaded to vote for a life sentence, the jury's advisory sentence would have been interpreted as a recommendation of life imprisonment, rather than the death penalty.

46

out of the twelve] members of Blanco's jury were inclined to mercy even without having been presented with any mitigating evidence and that a great deal of mitigating evidence was available to Blanco's attorneys had they more thoroughly investigated, we find that there was a reasonable probability that Blanco's jury might have recommended a life sentence absent the errors.").  The Supreme Court has "explained that there is no prejudice when the new mitigating evidence would barely have altered the sentencing profile presented to the decisionmaker."  *Sears v. Upton*, 561 U.S. 945, 954, 130 S. Ct. 3259, 3266 (2010) (quotation marks omitted).  But that is not the case here where absolutely none of the powerful mitigation story about Hardwick's childhood was told.

> As was the case in *Collier*, we believe that counsel's ineffectiveness
>
> precipitated a breakdown in the adversarial process.  The jury was called upon to determine whether a man whom they did not know would live or die; they were not presented with the particularized circumstances of his past and of his actions on the day[s] [surrounding] . . . the crime that would have allowed them fairly to balance the seriousness of his transgressions with the conditions of his life.  Had they been able to do so, we believe that it is at least reasonably probable that the jury would have returned a sentence other than death.

177 F.3d at 1204 (quotation marks omitted).

## IV.

Having found both deficient performance and prejudice under *Strickland*, we hold that John Gary Hardwick, Jr. did not receive effective assistance of counsel

47

during the penalty phase of his trial, in violation of the Sixth and Fourteenth Amendments of the Constitution.  We therefore AFFIRM the District Court's determination that Hardwick is entitled to habeas relief as to the penalty phase of his trial and REMAND with instructions that the District Court issue a writ of habeas corpus vacating Hardwick's sentence of death.  The State must either grant Hardwick a new sentencing proceeding within 180 days or resentence him to life imprisonment.

SO ORDERED.